## STATE OF CONNECTICUT *v.* HIPOLITO ORTIZ
## (SC 17450)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued September 20—officially released December 26, 2006

*David V. DeRosa,* special public defender, for the appellant (defendant).

*Mitchell S. Brody,* senior assistant state's attorney, with whom were *Terence D. Mariani,* senior assistant state's attorney, and, on the brief, *John A. Connelly,* state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Hipolito Ortiz, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (2), aiding and abetting burglary in the first degree in violation of General Statutes §§ 53a-8 and 53a-101 (a) (2), and aiding and abetting assault in the second degree in violation of General Statutes §§ 53a-8 and 53a-60 (a) (2). On appeal,[1] the defendant claims that he was

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we granted the state's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

deprived of his federal due process right[2] to a fair trial when the trial court: (1) denied his motion for a mistrial after the prosecutor had committed misconduct by continuing to offer into evidence a guilty plea pursuant to an agreement between the state and a codefendant, despite the court's having sustained the defendant's objection to that evidence; and (2) concluded that the plea agreement, which had not been disclosed by the state to the defendant was not "material" evidence under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We disagree, and affirm the judgment of conviction.

The jury reasonably could have found the following facts. Annette Gonzalez, the defendant's common-law wife, had engaged in a romantic relationship for approximately two years with the victim, Raymond Munoz, who was her coworker. The victim did not learn of Gonzalez' common-law marriage to the defendant until approximately one and one-half years into their relationship, but he continued to see her because the defendant was living in Puerto Rico at that time. The victim broke off his relationship with Gonzalez when the defendant moved to Waterbury to join her, but she continued to call the victim despite his requests that she stop doing so. Gonzalez had, however, kept her keys to the victim's apartment after the breakup. On December 23, 2001, the victim went to the home of Gonzalez' mother to recover those keys from Gonzalez. This led to a physical altercation between the defen-

---

[2] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ." Although the defendant also claims that his state due process right to a fair trial; see Conn. Const., art. I, § 8; was infringed upon by the alleged violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), "our decision is confined to the federal constitution because the defendant has failed to provide an independent analysis of the state constitutional issue." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 367 n.4, 832 A.2d 14 (2003).

dant, who was present, and the victim, during which the defendant hit the victim with a bat, and the victim bit the defendant's finger, causing the defendant a significant injury for which he was hospitalized. No criminal charges were filed against either the defendant or the victim in connection with that altercation.

Approximately one week later, the defendant, his brother, Michael Ortiz, and Angel Mundo, a friend of Ortiz, decided to attack the victim at his apartment in Waterbury.[3] Their plan was for Gonzalez to lure the victim from his apartment by calling him and inviting him to come talk to her. Mundo testified that, when the victim came out of his apartment, Mundo and Ortiz were to surprise and to subdue him, and then to use walkie-talkies that belonged to Gonzalez[4] to notify the defendant when the victim was secured. The defendant, who was to wait outside the apartment building because he had limited use of his hands as a result of his injured finger, was then to come up to the apartment and to kick the victim in the face.

At approximately 1 a.m. on December 31, 2001, the defendant, Mundo and Michael Ortiz drove to the victim's apartment in the defendant's car. In the meantime, Gonzalez had called the victim to invite him over to her house. When the victim left his apartment, Mundo and Ortiz, wearing ski masks and medical gloves, surprised him with a gun and forced him back into the apartment, while the defendant waited in the car. They

[3] Mundo was a friend of Michael Ortiz from Brooklyn, New York, where they both lived, and he did not know the defendant prior to the events at issue. Mundo participated in the plan at the behest of Ortiz, and first met the defendant in Brooklyn, where the defendant initially explained the plan. They then drove from New York to Waterbury, in order to execute the plan. To entice Mundo to participate, the defendant informed him that the victim was a drug dealer, and that there would be a large amount of cocaine in the apartment for him to take.

[4] The victim testified that Gonzalez usually used the walkie-talkies to communicate with her family on trips to Six Flags theme park.

then pistol-whipped the victim, bound him with duct tape and put a mask on his face. Their struggle, however, made a significant amount of noise as the victim slammed his feet on the floor, and a downstairs neighbor called the police.

The police responded quickly and, after speaking to the person who had reported the noise, they entered the victim's apartment, where Sergeant Michael Edwards and Officer Gregory LaFountain saw the victim on the floor with duct tape over his mouth and binding his hands. There also was blood on the floor, along with some medical gloves, a bloody Glock nine millimeter pistol and a purple walkie-talkie. The officers discovered Mundo and Ortiz hiding in the apartment and took them into custody, and then had the victim transported to the hospital for treatment of facial and head injuries.

Before he entered the apartment building, Edwards, who had heard a car on the block start its engine, had instructed Officer Anthony Tito to go with his partner and check that car. They found and questioned the defendant, who was attempting to leave the area in his Buick LeSabre, which was parked on the same side of the street as the victim's house, several car lengths from the front door.[5] A subsequent search of the defendant's car revealed medical gloves and a purple walkie-talkie matching the gloves and radio found in the victim's apartment. The officers arrested the defendant, Mundo and Michael Ortiz, and the defendant subsequently gave a statement to Detective Sergeant Eugene Coyle of the Waterbury police department.[6]

---

[5] The defendant told Tito that he was waiting there in the car, hoping to catch his girlfriend who was cheating on him.

[6] The defendant signed the following statement: "On 12/23/01 in the morning, my common law wife Annette Gonzalez, whom I have been with for eleven years and have a seven year old daughter with, and my other daughter all were at my mother-in-law's house at 197 South Leonard St. All of the sudden a man whom my wife has been fooling around with for some time used a credit card to slip the door lock and came into the house where we

Thereafter, the state filed a substitute information that charged the defendant with conspiracy to commit

were. His name is Raymond Munoz and I have known him for a couple of years now through mutual friends. We ended up in an argument and then a fight and Raymond nearly bit the middle finger on my right hand off. A neighbor in the building heard the fight and called police but Raymond left before the police could get him. I ended up in the emergency room and later found out that the finger was broken and that I would have to be operated on. They just put a small splint on it for now and left it unwrapped.

"On Christmas Day I [took] my family down to New York to drop off Christmas presents for my mother. When I got there I told my mother and my brother that I had gotten in a car accident and that is how I hurt my finger. My brother Michael Ortiz didn't believe that was how I had hurt my finger because he could see bite marks on it. Out of earshot of my mother Michael asked me what really happened to my finger and I told him the truth. Michael got real mad and asked me what I was going to do to Raymond for not only fooling around with my wife but also for biting me. Michael wanted to beat Raymond's ass but I told him no because I was going to sue him civilly to get my doctor's bills taken care of. Michael still wanted to beat Raymond for me, because I couldn't do it myself because of my hand. We didn't talk about Raymond any more that day.

"The day after Christmas I was operated on at Waterbury Hospital for my finger. They put some pins and some type of traction splint on it and I ended up staying over night.

"I didn't hear from my brother Michael again until Sunday on December thirtieth. He called me from New York and said that he was coming to Waterbury and that he would be here sometime Sunday night and that he would call me when he got here. He doesn't have a car so I figured he would need a ride from the bus station or train station when he got here. Michael said that he was coming to give Raymond Munoz his beating.

"On Sunday night, just before midnight my phone rang. Annette took the call and talked for only a minute. I figured it might be Michael and when [I] asked Annette who it was, she reluctantly told me that it was Raymond Munoz and that he was still bothering her. I got really mad because the guy was still calling my wife even after she told him that she wanted no more to do with him.

"A few minutes later the phone rang again, this time it was Michael and he told me that he was in Waterbury and he needed a ride. He said that he [was] someplace in the Brooklyn section of Waterbury and was walking. I got in my 1988 Buick LeSabre and found Michael walking near St. Patrick's Church. He wasn't alone though. He had a friend of his from New York whom I never met before. His name was Angel according to my brother but they never told me his last name. Michael said that Angel was going to help him kick Raymond Munoz's ass. Michael asked me to show them where Raymond's house was. I drove them to 38 Fifth St. and pointed out Raymond's house. I told them that Raymond lived alone on the third floor. I told them Raymond always carries guns so I told Michael to be careful. Michael said that they were going to go to the back door and that they would get him

burglary in the first degree, aiding and abetting burglary in the first degree, and aiding and abetting assault in the second degree.[7] After trial, the jury returned a verdict of guilty on all counts of the substitute information. The trial court, *Hartmere, J.*, sentenced the defendant to concurrent five year sentences on the burglary charges plus a consecutive three year sentence on the aiding and

to open the door somehow or just kick the door in and then rush him and beat his ass. Michael told me to pull up the street a little bit and just wait for them in the car until they finished beating him. I had a set of my daughter's play [walkie-talkies] in my car. Michael took one of them with him and I had the other. Michael was going to call me on the radio and tell me where to pick him and Angel up after they finished. They both pulled up the hoods they were wearing onto their heads to hide their faces and got out of the car and walked towards Raymond's. I turned on the [walkie-talkie] I had and it was then that I reali[z]ed the battery was dead and wouldn't work. I just stayed parked where I was because they wouldn't be able to tell me where to pick them up because my radio was dead.

"I only waited for only a couple of minutes when a bunch of police cars showed up. The police asked me what I was doing there and I told them that my wife was cheating on me with a man who lived on Fifth St. and I was trying to catch her with him. I gave them my identification but they would not let me leave. Moments later they came out of Raymond's house with my brother Michael Ortiz and his [friend] Angel. They were both under arrest. [Evidently] they caught them in Raymond's house. An ambulance showed up and I saw them put Raymond inside. The police then found out that Michael was my brother and they searched my car. They found the [walkie-talkie] I had in my car and matched it with the one they found inside Raymond's house. They also found a latex glove on my passenger seat and told me that this matched the latex gloves that Michael and Angel had on when they were caught inside Raymond's house after they had beaten him up.

"I was taken to the police station by some uniform[ed] officers and then taken to the detective bureau. At first I told the detectives that I didn't know anything about this but sometime later Sgt. Coyle talked with me and advised me of my rights. I reali[z]e I made a mistake and I decided to tell Sgt. Coyle the truth and give this statement."

We note that the trial court denied the defendant's motion to suppress this statement. The defendant has not, however, appealed from that ruling.

[7] The state initially had charged the defendant with aiding and abetting assault in the first degree in violation of General Statutes § 53a-59. The trial court, however, granted the defendant's motion for a judgment of acquittal on that charge, finding no evidence of a "serious physical injury" to the victim, but concluded that there was sufficient evidence on the lesser included offense of assault in the second degree with a dangerous instrument in violation of § 53a-60 (a) (2).The court then granted the state permission to file a substitute information.

abetting assault charge, for a total effective sentence of eight years imprisonment. This appeal followed.

On appeal, the defendant claims that the trial court improperly: (1) denied his motion for a mistrial after the prosecutor had engaged in misconduct by disregarding, on multiple occasions, the court's rulings precluding the state from introducing Mundo's guilty pleas into evidence; and (2) concluded that an undisclosed plea agreement between the state and Mundo was not "material" evidence under *Brady* v. *Maryland*, supra, 373 U.S. 87, because there was no reasonable possibility that its disclosure would have affected the result of the defendant's trial or sentencing. Additional relevant facts and procedural history will be set forward in the context of each claim on appeal.

I

We begin with the defendant's claim that he was deprived of a fair trial when the trial court denied his motion for a mistrial on the basis of the prosecutor's repeated references to the guilty plea of Mundo, a coconspirator. Specifically, the defendant claims that, under this court's decision in *State* v. *Pikul*, 150 Conn. 195, 187 A.2d 442 (1962), the trial court properly precluded the use of Mundo's guilty plea to prove the defendant's guilt, and that the prosecutor's repeated references to the plea operated to subvert that legally correct order, thereby depriving him of a fair trial.

The record reveals the following additional relevant facts and procedural history, much of which consists of the questioning and testimony of Mundo, to illustrate the context of the prosecutorial actions at issue. On September 2, 2003, Mundo pleaded guilty to one count of burglary in the first degree in violation of § 53a-101 (a) (2), and one count of conspiracy to commit burglary in the first degree in violation of §§ 53a-48 and 53a-101 (a) (2). At that proceeding, which had been held more

than one month prior to the defendant's trial, the prosecutor told the court that the agreed upon sentence recommendation for Mundo was eight years imprisonment. After both sides waived presentence investigation, the trial court, *Iannotti, J.*, granted Mundo's request to continue his sentencing for six weeks.

In the period after the court had accepted his plea, but before his sentencing, Mundo testified at the defendant's trial. During the initial questions of his direct examination by the prosecutor, Terence Mariani, Mundo stated that he resided at the Gardner correctional institution because he had been convicted of "burglary one." At that point, the defendant objected and moved to strike that comment. When offered the opportunity to respond to the defendant's objection, the prosecutor stated that he would "move on," and the trial court, *Hartmere, J.*, did not rule further on the defendant's objection at that time.[8] The prosecutor then asked Mundo, "[w]hat events landed you in jail," and Mundo went on to explain how he had met the defendant through Michael Ortiz, and how the defendant's plan to attack the victim had developed.

After Mundo testified about the plan and the events of December 31, 2001, he then responded affirmatively

---

[8] The following exchange took place during the prosecutor's direct examination of Mundo:

"[The Prosecutor]: Where do you currently live? Like, where were you earlier today?

"[Mundo]: Gardner correctional facility.

"[The Prosecutor]: You're an inmate there?

"[Mundo]: Yes, sir.

"[The Prosecutor]: Why is it that you're there?

"[Mundo]: I got convicted of burglary one.

"[Defense Counsel]: I would object. Ask that be stricken, Judge. We know he's been arrested. I think to go beyond that is improper. I'll make a legal argument, if need be. I think that's an improper—that response should not have been elicited.

"The Court: Mr. Mariani?

"[The Prosecutor]: I'll move on, Judge."

when the prosecutor had asked him about his "own run-ins with the law in the past," and his "quite . . . lengthy criminal record . . . ." The prosecutor then asked Mundo specifically whether he had been convicted of burglary in the first degree in the present case. The defendant objected to this question, arguing that the objection already had been sustained by the trial court. Although the prosecutor argued that "[t]he fact that he's been convicted of kinds of felonies is admissible," the trial court characterized that answer as a "separate question" and directed the prosecutor to "[m]ove on . . . ." At this point, the prosecutor concluded his direct examination.[9]

The defendant's counsel, Leonard Crone, then commenced his cross-examination of Mundo, asking him extensively about the various aliases that he had used, including on the night he was arrested in the present

[9] The transcript reveals the following colloquy occurred on the prosecutor's direct examination of Mundo:

"[The Prosecutor]: Now, you certainly have had your own run-ins with the law in the past; right?

"[Mundo]: Oh, yes, sir.

"[The Prosecutor]: You have quite a lengthy criminal record; is that fair to say?

"[Mundo]: Yes.

"[The Prosecutor]: You've been convicted of a number of different crimes?

"[Mundo]: But none of them were violent.

"[The Prosecutor]: In particular, in this case you were convicted of burglary in the first degree; right?

"[Defense Counsel]: Objection, Judge. That objection was already sustained.

"The Court: Mr. Mariani?

"[Defense Counsel]: I would like to make a motion after. I'll wait.

"[The Prosecutor]: The fact that he's been convicted of kinds of felonies is admissible.

"The Court: That's a separate question, Mr. Mariani. Move on to another question.

"[The Prosecutor]: All right. You've been in plenty of other trouble before; right?

"[Mundo]: Yeah. Nothing serious.

"[The Prosecutor]: I don't have any other questions."

case. Mundo stated that he had used the aliases while on drugs,[10] and also admitted to lying frequently. He also testified about his intravenous cocaine and heroin use, including on the day at issue, as well as his nineteen page criminal record containing numerous convictions for, inter alia, drug possession, burglary, larceny, fraud, turnstile jumping and robbery. Defense counsel then asked Mundo how he liked jail, at which point Mundo testified that, "I don't like it in jail, but the way I was going it's better than being homeless on the streets." Mundo then testified that he would like to shorten his stay in prison, but gave conflicting answers about whether he could do that by testifying in this case. He did, however, testify that he had no expectations of leniency at his sentencing because no promises had been made to him and he had "already copped out to the time [he] was offered." At that point, defense counsel stated, "You haven't been sentenced, Mr. Mundo. Don't lie to the jury."[11]

---

[10] Mundo testified that he could not remember exactly how many aliases he has used, but that he recalled using "Hector Rivera," "Joseph Mundo," and "Christopher Ortiz" on previous occasions. Indeed, he testified that he had used the latter alias when he was arrested in connection with the present case. Mundo, however, realized that, "[d]eep down inside I know they will [find out who I am] once they take the fingerprints because I've been through the system . . . ."

[11] The transcript reveals the following colloquy took place on defense counsel's cross-examination of Mundo:

"[Defense Counsel]: Is it your testimony that you'd rather be where you are right now than outside?

"[Mundo]: No, I don't rather be where I'm at right now. I would like to get another chance to try to change, but I take responsibilities for what I did, you know, but I'm not going to—

"[Defense Counsel]: Go ahead. Are you done with your answer?

"[Mundo]: Yes.

"[Defense Counsel]: You would like to get out of jail as soon as possible; correct?

"[Mundo]: Yes.

"[Defense Counsel]: I can't hear you.

"[Mundo]: Yes.

"[Defense Counsel]: And one way you could do that is by testifying in this case; right?

The prosecutor then objected to the defendant's characterization of Mundo's testimony "as a lie," saying the defendant knew that "to be untrue," and that the prosecutor had Mundo's plea transcript with him. The defendant reiterated to the trial court that Mundo had not yet been sentenced. The court told the prosecutor, "I don't know what you're talking about either . . . . You are using very strong language concerning what you know.

"[The Prosecutor]: There's an agreed upon recommendation. He's already [pleaded] guilty. [Defense counsel] was provided the transcript of that. He's read it.

"[Defense Counsel]: I haven't been given a transcript. Again, I don't think his guilty plea is something that should be—

"[The Prosecutor]: I handed him the transcript the other day and he sat here and read it, Judge.

"The Court: Degenerating quickly here. What's the objection?

"[The Prosecutor]: That that is a misstatement of fact.

"The Court: All right, I'll overrule the objection."

At this point, questioning continued and Mundo testified that he had not been sentenced yet, and that his sentencing had been postponed until after the defendant's trial. Defense counsel then asked Mundo whether

"[Mundo]: No.

"[Defense Counsel]: No?

"[Mundo]: No promises were made for me, no deals were made to me, nothing was made to me.

"[Defense Counsel]: What is your expectation?

"[Mundo]: I have no expectation. I already copped out to the time I was offered.

"[Defense Counsel]: You haven't been sentenced, Mr. Mundo. Don't lie to the jury.

"[Mundo]: I didn't say—"

he was "here testifying because you're a good guy?" Mundo testified that he came to testify because "I got taken for a fool. You understand? I'm here testifying because I was told it was supposed to be done a certain way. Something was supposed to get out of it, after I was incarcerated . . . ." Mundo then testified that he was told that there would be drugs for him in the victim's apartment once the beating concluded. When defense counsel again asked whether Mundo "expect[ed] testifying in this case is going to somehow help you at the time of your sentence," Mundo replied in the negative. Mundo testified that he did not "expect" his testimony to help at his sentencing, because he had not been told that it would do so. When defense counsel asked whether Mundo "hoped" that his testimony would help at his sentencing, Mundo testified: "No. The only thing that I'm hoping that the time I'm going to do, I'm going to share it with the person that brought me to Connecticut." Mundo, however, also testified about the opportunity to obtain a sentence modification, and agreed that he would do whatever he could to attain a lower sentence.

After Mundo testified further about his involvement in the attack, and the gun used therein, defense counsel again asked Mundo about whether he had spoken to the state about his testimony against the defendant. Mundo testified that he had spoken to the prosecutor twice, and that he had approached the state through his attorney about testifying. He told his attorney that, "[i]f I'm going to go to jail, all the people responsible are going to go with me also." Mundo testified that he had told the prosecutor what happened, that he made the decision to testify in this case, and that the prosecutor had reviewed his testimony and the exhibits with him. Cross-examination concluded when Mundo stated that he had no expectation of benefiting from his testimony.

On redirect examination, the prosecutor moved for the admission into evidence of the transcript from Mundo's plea hearing. The trial court sustained the defendant's objection to its admission without giving reasons for the ruling. The prosecutor then asked Mundo whether he had pleaded guilty to a crime in September, 2003, and the defendant objected immediately. At this point, the trial court excused the jury, and heard arguments on the admissibility of the transcript. The prosecutor explained that the allocution in the transcript would contradict Mundo's story that he was there to buy drugs from the victim, and also was "extremely relevant on the point of . . . any expectations that Mr. Mundo had as to what was going to happen with the disposition of this case. His case based on his testimony and the transcript I would submit clearly indicates that it's an agreed upon recommendation, that he's going to get eight years." Legal argument then ensued as to the propriety of that line of questioning, and defense counsel moved for a mistrial because he argued that the questioning had created "a prejudice that we may not be able to overcome in this case. I don't think it's proper. I think [the prosecutor] knows it was not proper. The objection was sustained. You told him not to ask it. He just kept on asking." The prosecutor responded that the agreed upon sentence recommendation in the transcript rebutted the defendant's goal of showing that Mundo expected consideration for his testimony. The court, however, agreed with the defendant's position that the case had not yet been disposed of, especially after the state admitted that it could lower the recommendation prior to sentencing.

After further argument, the trial court denied the motion for a mistrial. The trial court stated: "I've done a lot of conspiracy cases. My understanding was always after someone had been impeached, his credibility had been attacked, depending on the nature of the cross-

examination, [convictions of coconspirators] could be used, and even then, as I understand it, it's quite discretionary. You offered the initial conviction early in the testimony of the witness. There had been no impeachment. I sustained the objection. I am a bit concerned that you make yourself the arbiter of whether further questions in the same area are appropriate, Mr. Mariani. I trust I won't see that again. If I sustain an objection to something, do not go into it because you think the law is to the contrary. Get an opinion from the court out of the presence of the jury in the future." The trial court further concluded that there was no prejudice to the defendant because the transcript had been offered only as a "transcript," but reiterated that it would not be admissible for impeachment. The trial court then offered a curative instruction, but the defendant declined that offer because he was "afraid that would highlight something." The trial court also stated, "I don't think the jury grasped the issue as you framed it. I know I didn't in the beginning. As I said, I don't know what it was in terms of the transcript. The other questions, the objection was sustained."

On appeal, the defendant claims that, under this court's decision in *State* v. *Pikul*, supra, 150 Conn. 195, the trial court properly precluded the use of evidence of Mundo's guilty plea to prove the defendant's guilt, and that the prosecutor's repeated references to the plea operated to subvert that legally correct order. The defendant further contends that, under the test articulated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), he was deprived of a fair trial because the prosecutor's misconduct was frequent and the credibility of Mundo's testimony was absolutely essential to proving the accessory and conspiracy charges of which the defendant was convicted.[12] In response, the state

[12] We note, however, that the defendant explicitly declined to claim that the prosecutor's actions amounted to the deliberate disobedience of a trial court's orders requiring reversal pursuant to this court's supervisory author-

concedes that the trial prosecutor improperly contravened the trial court's preclusion ruling by continuing to seek admission of the guilty plea, but contends that the defendant's rights were not prejudiced because the circumstances surrounding Mundo's guilty plea properly had been explored at trial by both the defendant and the state. The state also claims that there was no due process violation because the defendant's own statement corroborated Mundo's testimony. We agree with the state.

"The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court."

ity. See, e.g., *State* v. *Ceballos*, 266 Conn. 364, 403–404, 832 A.2d 14 (2003) ("Whether a prosecutor's improper conduct was a *deliberate circumvention* of the trial court's express rulings is significant because we apply a different standard as such misconduct involves prejudice to the entire judicial system, in addition to prejudice to the defendant. . . . [A] new trial ordered because of a prosecutor's deliberate violation of trial court rulings is ordered pursuant to this court's supervisory powers, rather than to remedy the violation of the defendant's due process rights." [Citations omitted; emphasis added; internal quotation marks omitted.]).

(Internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 413, 869 A.2d 1236 (2005); see also *State* v. *Nash*, 278 Conn. 620, 657, 899 A.2d 1 (2006) ("[i]n our review of the denial of a motion for [a] mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial" [internal quotation marks omitted]).

Indeed, "[w]hen a mistrial is sought on the ground that a prosecutor's improper remarks violated the defendant's constitutional right to due process of law the same standard applies. . . . The burden on the defendant is to show that the prosecutor's remarks were prejudicial in light of the entire proceeding. . . . The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Citations omitted.) *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see also *State* v. *James G.*, 268 Conn. 382, 420, 844 A.2d 810 (2004) ("we have afforded deference to trial courts in deciding whether to deny a defendant's motion for a mistrial that is based on prosecutorial misconduct").

"In reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) *State* v. *Nash*, supra, 278 Conn. 658.

The defendant's claim is predicated on what he characterizes as the prosecutor's disobedience of the trial court's ruling precluding admission of the transcript or any discussion of Mundo's conviction for his actions on the night in question.[13] It is well settled that prosecutorial disobedience of a trial court order, even one that the prosecutor considers legally incorrect, constitutes improper conduct. See, e.g., *State* v. *Ceballos*, 266 Conn. 364, 403–404, 832 A.2d 14 (2003). Even if we were to assume that the prosecutor in this case committed misconduct by disobeying those evidentiary rulings by the trial court, his actions nevertheless do not amount to a due process violation requiring reversal of the defendant's convictions.

---

[13] We assume the propriety of the trial court's evidentiary ruling, which reflects its accommodation between two well settled, but potentially competing principles governing the admissibility of convictions or guilty pleas. Specifically, "[t]he fact that one or more persons jointly charged with the commission of a crime pleaded guilty is not admissible on the trial of another person so charged, to establish that the crime was committed. . . . This is so because a plea of guilty is, in effect, merely a confession of guilt which, having been made by one of those charged with the crime, can be no more than hearsay as to another who is so charged." (Citations omitted.) *State* v. *Pikul*, supra, 150 Conn. 198. "This is not to say, however, that evidence of a plea of guilty by one who was charged jointly with an accused and who is produced as a witness by the state would not be admissible if it was offered by the accused, or elicited by him on cross-examination, to attack the credibility of the witness; or that if such a witness was produced by the defense, the evidence would not be similarly admissible on an offer by the state." Id., 199.

The defendant claims that the trial court's ruling was a permissible exercise of the trial court's discretion. The state contends, however, that the trial court's ruling was legally incorrect and gave the defendant "an unwarranted benefit about which he cannot now complain on appeal," because he "unfairly profited from the state being precluded from presenting persuasive evidence in support of Mundo's testimony that his expectations in cooperating with, and testifying for, the state were limited to the agreed-upon sentence recommendation that was part of the plea bargain and that was predicated on his guilty pleas." The state also asserts that the trial court improperly ruled that the conviction evidence could not come in because Mundo had not yet been impeached. For purposes of this appeal, we need not evaluate the legal correctness of the trial court's evidentiary ruling.

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 380, 897 A.2d 569 (2006). "[T]he defendant in a claim of prosecutorial misconduct must establish that the prosecutorial misconduct was so serious as to amount to a denial of due process . . . . In evaluating whether the misconduct rose to this level, we consider the factors enumerated by this court in *State* v. *Williams*, [supra, 204 Conn. 540]. . . . These factors include the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Warholic*, supra, 360–61.

Application of the factors enumerated in *State* v. *Williams*, supra, 204 Conn. 540, to this record demonstrates that the prosecutor's disregard of the trial court's rulings precluding the use of Mundo's guilty plea did not violate the defendant's due process rights. Beginning with the first factor, namely, the extent to which the alleged misconduct was invited by defense conduct or argument, the prosecutor introduced the subject of the defendant's conviction twice briefly on direct examination, defense counsel objected both times, and the prosecutor moved on from that line of questioning without the benefit of further argument or a definitive ruling by the trial court. See footnotes 8 and 9 of this opinion

and the accompanying text. On cross-examination, however, defense counsel, after inquiring about Mundo's prodigious criminal history, inquired extensively about any expectations that Mundo had in connection with his testimony, a line of questioning that itself clearly implied that Mundo had a criminal conviction as a result of his involvement in the activities at issue. See footnote 11 of this opinion and the accompanying text. On redirect examination, however, the prosecutor again attempted to introduce the transcript of Mundo's plea. It was only at this point that the jury was excused. The prosecutor explained that he wanted to introduce the transcript to rebut the defendant's cross-examination of Mundo with respect to any expectations of leniency that he might expect from his testimony. It was only at this point that full legal argument ensued over the admissibility of Mundo's guilty pleas, and the trial court relied on the fact that the sentence still could be changed as not refuting the defendant's cross-examination. To the extent, however, that the prosecutor was improperly aggressive in continuing to seek the admission of the plea transcript in the face of the trial court's orders, that action was encouraged, if not invited, by defense counsel's appropriate questioning exploring Mundo's motives for testifying against the defendant. Indeed, it was not until the fourth attempt that the questions regarding the pleas' admissibility were resolved explicitly for the duration of the trial, and the law regarding the admissibility of such pleas or convictions under *State* v. *Pikul*, supra, 150 Conn. 198, is itself far from definitive. See footnote 13 of this opinion.

We address together the second and third factors, namely, the severity and frequency of the misconduct. With the exception of the alleged *Brady* violation; see part II of this opinion; the alleged misconduct was limited to the prosecutor's attempts to address one discrete

subject during the course of his direct and redirect examinations of Mundo. Indeed, the state did not refer to Mundo's conviction in its opening or rebuttal summations. This is not, for example, a case wherein reversal is required because a variety of different types of misconduct had been committed during the course of both cross-examination and summations. See, e.g., *State* v. *Warholic*, supra, 278 Conn. 398 ("[w]e first conclude that the instances of prosecutorial misconduct were not isolated because they occurred during both the cross-examination of the defendant and the prosecutor's closing and rebuttal arguments"); *State* v. *Ceballos*, supra, 266 Conn. 410 (same); see also *State* v. *Just*, 185 Conn. 339, 349–50, 441 A.2d 98 (1981) ("Another factor militating against finding harmful error in this case is the lack of any claim by the defendant that the evidence of the witnesses' guilty pleas was ever again brought to the attention of the jury by the state in a prejudicial fashion. There is no claim that the testimony of the pleas was either emphasized by the state, or argued by the state during final argument."). Moreover, we also note that the misconduct was not particularly flagrant or severe, in light of the fact that the trial court did not rule definitively on the *Pikul* issue until after the prosecutor's fourth "offense."

With respect to the curative measures, there were none. This was, however, because the defendant made the tactical decision to decline the trial court's offer of a curative instruction, determining that such an instruction would highlight what he concluded was improper evidence of Mundo's conviction. The fact, however, that experienced defense counsel, having the vantage point to observe firsthand the impact of that evidence on the jury, deemed it not so harmful as to require an instruction, and that such an instruction might only highlight the impropriety, mitigates against a finding that this misconduct by itself deprived the defendant of

his fair trial. Indeed, the trial court agreed with defense counsel's assessment of the situation, when it denied the motion for a mistrial. See *State* v. *Pepper*, 79 Conn. App. 1, 21, 828 A.2d 1268 (2003) ("[o]ur conclusion that any misconduct was not severe is highlighted by the fact that no objection or curative instructions were sought by the defendant at trial"), aff'd, 272 Conn. 10, 860 A.2d 1221 (2004) (per curiam); cf. *State* v. *Ceballos*, supra, 266 Conn. 414 ("defense counsel may elect not to object to arguments that he or she deems 'marginally objectionable' for tactical reasons, namely, 'because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument' "); *State* v. *Just*, supra, 185 Conn. 351–52 ("[o]ne legitimate defense consideration might be a concern that the remedy could be more injurious than the malady—that is, that a corrective instruction might call more attention to a witness' guilty plea than the witness' admission" [internal quotation marks omitted]).

Finally, the misconduct related to the credibility of Mundo's testimony, which undoubtedly was significant to the state's case against the defendant. The state did, however, have a strong circumstantial case of the defendant's conspiratorial activities[14] even without Mundo's

[14] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

"To establish the crime of conspiracy under § 53a-48, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy . . . . The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . .

"Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite

testimony, as shown by evidence taken from the defendant's car located outside the scene of the crime, including the matching walkie-talkie and rubber gloves. This evidence, in addition to the defendant's own inculpatory statement to the police, notwithstanding the fact that his statement differed from Mundo's account of the events in several ways, nevertheless demonstrated his participation in the planning of the attack on the victim. See footnote 6 of this opinion. Finally, the defendant had the opportunity to cross-examine Mundo extensively as to his credibility and interest in this case, and elicited the fact that he had not been sentenced yet.[15] See footnote 11 of this opinion and the accompanying text. This served to mitigate any harm caused by the state's violation of the court's orders.

Finally, given Mundo's extensive testimony about his involvement in the events at issue, we also find instructive this court's decision in State v. Just, supra, 185 Conn. 339, wherein this court held harmless the improper admission of a coconspirator's conviction or guilty plea to establish that the crime had been committed. In Just, the court noted that the accomplices had "testified at length. It was only at the end of their direct testimony and after each had implicated himself and the defendant that testimony was elicited about their convictions concerning the criminal activity involving themselves and the defendant. This evidence, quite

---

agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Citations omitted; internal quotation marks omitted.) State v. Patterson, 276 Conn. 452, 461–62, 886 A.2d 777 (2005).

[15] We also note that the defendant effectively utilized information gained during cross-examination to attack Mundo's credibility during summation. Specifically, defense counsel referred to Mundo as "Pulp Fiction in real life. Think about it. He's an admitted thief, liar, addict, robber, burglar." The defendant also discussed Mundo's motivation to do anything to get out of jail.

apart from that of their guilty pleas, was properly received—its breadth and detail probative of the defendant's guilt. . . . The purpose of the witness' testimony was to give the facts and circumstances of the crime[s]. The testimony as to their pleas of guilty gave the circumstances under which they were testifying, and their status with regard to the charge, and went to their credibility as witnesses for the state. . . . Any prejudice resulting from the testimony of the pleas was rendered harmless when the guilt of the accomplices was established by their own testimony which also implicated the defendant." (Citations omitted; internal quotation marks omitted.) Id., 349; see also *State* v. *Dillard*, 66 Conn. App. 238, 244, 784 A.2d 387 (following *Just* and concluding reversal not required when "evidence of the codefendants' pleas of guilty came from the witnesses' own testimony and was inextricably linked with their testimony and other evidence regarding the circumstances surrounding the robbery"), cert. denied, 258 Conn. 943, 786 A.2d 431 (2001).

Accordingly, on the basis of our review of the record, we conclude that the prosecutor's actions did not deprive the defendant of a fair trial. The trial court, therefore, did not abuse its discretion when it denied the defendant's motion for a mistrial.

## II

We next turn to the defendant's claim that he was deprived of a fair trial by virtue of the state's failure to disclose, pursuant to *Brady* v. *Maryland*, supra, 373 U.S. 83, its agreement with Mundo to bring his cooperation and testimony to the attention of his sentencing court. The defendant contends that this agreement was critical impeachment evidence, the absence of which diminished the effectiveness of his cross-examination of Mundo, an important witness for the state. In response, the state concedes that it did not disclose

the agreement to the defendant, but contends that this nondisclosure did not affect the verdict because the defendant himself corroborated important parts of Mundo's testimony. The state also notes that the defendant's counsel was aware of the fact that Mundo's cooperation could be brought to the attention of his sentencing judge, and that the defendant engaged in a comprehensive cross-examination of Mundo that covered his sentencing expectations. We agree with the state.

The record reveals the following additional facts and procedural history. After Mundo had testified at the defendant's trial, the state brought his cooperation to the attention of the court, *Iannotti, J.*, and stated that it was now recommending a six year sentence. Mundo's defense counsel also asked the court to take Mundo's testimony at the defendant's trial into consideration when fashioning the sentence. The court stated that it believed that Mundo had testified honestly in the defendant's trial, and that "consideration must be given to Mr. Mundo with regard to his testimony so that he receive a better sentence than the eight years that was originally offered." The court then sentenced Mundo to a total effective sentence of six years imprisonment.

After the defendant filed this appeal in the Appellate Court, he learned of Mundo's six year sentence, rather than the eight year sentence that had been discussed at trial, and determined that the state might have violated *Brady* by failing to disclose an agreement to that effect that could have been used as impeachment evidence. In order to "inquire into the [s]tate's failure to disclose the nature of the plea agreement" and develop this claim, the defendant filed a motion for augmentation and rectification of the record pursuant to *State* v. *Floyd*, 253 Conn. 700, 756 A.2d 799 (2000), and Practice Book §§ 60-2, 61-10 and 66-5 (*Floyd* hearing). The state opposed this motion, claiming that it was an inappropri-

ate attempt to supplement the record, as the defendant's *Brady* claim was unpreserved and, therefore, could be raised only pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[16] and also, that there was insufficient evidence to justify such a hearing.

The trial court, *Hartmere, J.,* determined that there was sufficient evidence to justify a *Floyd* hearing and granted the defendant's motion for rectification. The trial court reasoned that requiring the defendant to wait for a collateral attack of his conviction would be a classic case of "justice delayed, is sometimes justice denied." The trial court then denied the state's request for a stay pending review of its order, and the Appellate Court upheld the trial court's denial of the stay following the state's motion for review. The Appellate Court also granted the state's motion for review of the trial court's decision to hold a *Floyd* hearing, but denied the relief requested without prejudice to filing a subsequent post-hearing motion for review. The trial court then held the *Floyd* hearing and issued a memorandum of decision augmenting the record. Thereafter, this court granted the state's motion to transfer this appeal to itself pursuant to Practice Book § 65-2, and we then upheld the trial court's decision to hold a *Floyd* hearing when we granted the state's motion for review, but denied the relief requested therein.[17]

---

[16] Under *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

[17] In its brief, the state claims that the *Floyd* hearing procedure is inconsistent with the first prong of *Golding*, which governs the review of unpreserved claims, and requires the defendant to produce a "record . . . adequate to review the alleged claim of error"; *State* v. *Golding*, supra, 213 Conn. 239; and asks us to reconcile this tension. Under the first prong of *Golding*, "[t]he defendant bears the responsibility for providing a record that is adequate for

After the *Floyd* hearing, the trial court issued a memorandum of decision finding the following facts. "Alan

review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." Id., 240. The state recognizes correctly that the first prong of *Golding* "was designed to avoid remands for the purpose of supplementing the record." *State* v. *Stanley*, 223 Conn. 674, 690, 613 A.2d 788 (1992). The state also recognizes correctly that our decision in *State* v. *Floyd*, supra, 253 Conn. 732–33, described a procedure by which this court granted a defendant's motion for review and ordered a trial court to hold an evidentiary hearing during a pending appeal to explore an alleged *Brady* violation, but did not explain the basis for that decision. We take the opportunity to do so here.

*Floyd* hearings to explore claims of potential *Brady* violations are ordered pursuant to the appellate courts' supervisory authority under Practice Book § 60-2, which provides in relevant part: "The supervision and control of the proceedings on appeal shall be in the court having appellate jurisdiction from the time the appeal is filed, or earlier, if appropriate, and, except as otherwise provided in these rules, any motion the purpose of which is to *complete or perfect the trial court record for presentation on appeal* shall be made to the court in which the appeal is pending. The court . . . may also, for example, on its own motion or upon motion of any party, (1) order a judge to take any action necessary to complete the trial court record for the proper presentation of the appeal . . . (9) remand any pending matter to the trial court for the resolution of factual issues where necessary . . . ." We will order a *Floyd* hearing to develop a potential *Brady* violation only in "the unusual situation in which a defendant was precluded from perfecting the record due to new information obtained after judgment." *State* v. *Hamlin*, 90 Conn. App. 445, 453, 878 A.2d 374 (declining defendant's request to remand for *Floyd* hearing when record demonstrated that "defendant was aware, prior to both the suppression hearing and trial, that the holding cell conversation had occurred"), cert. denied, 276 Conn. 914, 888 A.2d 86 (2005). A *Floyd* hearing is not a license to engage in a posttrial fishing expedition, as the court will not hold a hearing in the absence of sufficient prima facie evidence, direct or circumstantial, of a *Brady* violation unascertainable at trial. See *State* v. *Sanchez*, 84 Conn. App. 583, 586 n.4, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004). The trial court's decision with respect to whether to hold a *Floyd* hearing is reviewable by motion for review pursuant to Practice Book § 66-7, which provides in relevant part: "Any party aggrieved by the action of the trial judge as regards rectification of the appeal or articulation under Section 66-5 may, within ten days of the issuance of notice of the order sought to be reviewed, make a written motion for review to the court, to be filed with the appellate clerk, and the court may, upon such a motion, direct any action it deems proper. . . ." See *State* v. *Floyd*, supra, 253 Conn. 732.

The state has contended in its opposition to the defendant's motion that defendants are free to make *Brady* claims that could not be developed at

McWhirter, the public defender for the judicial district of Waterbury, represented Mundo on the underlying burglary and assault charges. The state's attorney, John Connelly, originally handled the prosecution of the three codefendants himself and was adamant that he did not want the cooperation of Mundo. In the judicial district of Waterbury, the state's attorney personally controls all part A and some part B sentencing offers to defendants. The sentencing offer to each of the three codefendants involved in this case was eight years, which was set by the state's attorney. The state's attorney assigned assistant state's attorney [Mariani] to the cases when they were called in for trial. All three codefendants were offered plea bargains of eight years incarceration; Michael Ortiz and Mundo accepted the offers and pleaded guilty.

"Although the state's attorney was adamant that he did not want cooperation from Mundo, the public defender concluded from the beginning that if the defendant['s] . . . case ever went to trial, the state might find Mundo's testimony to be useful in its prosecution. His rationale was that Mundo and Michael Ortiz had been apprehended inside the victim's apartment while committing the criminal acts, whereas the defendant . . . was outside in a vehicle. Once Mariani began preparing the case against [the defendant] for trial, he called the public defender to determine if Mundo was still interested in cooperating. Thereafter, Mariani met with Mundo and his attorney in the lockup at the Water-

---

trial in collateral attacks via habeas corpus proceedings. This approach, however, fosters delay as the proceedings on direct appeal are exhausted prior to the commencement of habeas proceedings, and deprives a trial court already familiar with the matter of the opportunity to address *Brady* claims in a timely fashion. In contrast, *Floyd* hearings permit the rapid resolution of these fact sensitive constitutional issues and mitigate the effects of the passage of time that would accompany requiring defendants to wait to address these matters until after the conclusion of direct appellate review. Indeed, the potential memory fade attendant to this delay conceivably might even reward the state for violating *Brady*.

bury courthouse. An agreement was reached that the prosecutor would bring Mundo's cooperation to the attention of the sentencing judge. The public defender testified that 'when my client agreed to testify in [the defendant's] trial, the only understanding that existed was that his—the fact of his testifying would be brought to the attention of the sentencing judge at the time my client was sentenced. There was no discussion whatsoever as to numbers, promises of any kind. Simply that his act of testifying would be brought to the attention of the sentencing judge for whatever benefit the sentencing judge might feel was appropriate.'

"The defendant's trial attorney was unaware and had not been told of any agreement between the state and Mundo's attorney to bring Mundo's cooperation to the attention of Mundo's sentencing judge during the defendant's trial. The defendant's trial attorney also was unaware of this agreement at the defendant's disposition, although Mariani stated on the record just prior to the defendant's sentencing that the state would bring Mundo's cooperation to the attention of Mundo's sentencing judge."

The trial court further noted that the prosecutor's "repeated references" during the examination of Mundo "to an agreed recommendation were misleading," notwithstanding the fact that, "[i]n the colloquy with the court held outside the jury's presence . . . the prosecutor did admit that the recommendation could be changed prior to disposition. Additionally, at the defendant's disposition, the prosecutor did inform the court that he would make the sentencing court aware of Mundo's cooperation at Mundo's disposition." As noted previously, after being made aware of Mundo's cooperation at the defendant's trial, the sentencing court, *Iannotti, J.*, sentenced Mundo to six years imprisonment.[18]

[18] We note that the record reveals that the state initially adhered to its eight year recommendation for Mundo, even after he had testified at the defendant's trial. In a chambers conference prior to Mundo's sentencing,

The trial court found that the state had entered into an agreement whereby Mundo's testimony would be brought to the attention of the sentencing judge, and that the state improperly had failed to disclose that agreement to the court or to the defendant prior to or during the defendant's trial and sentencing. The trial court also concluded, however, that there was no " 'reasonable probability' " that this suppression would have affected the outcome of the trial or sentencing. The court found "troubling" the "prosecutor's repeated references during the trial proceedings to the 'agreed recommendation' of an eight year sentence for the witness while at the same time having this undisclosed agreement with the witness and the witness' attorney to bring the witness' cooperation to the attention of the sentencing judge. . . . The repeated references to an agreed recommendation were misleading." (Citation omitted.)

Nevertheless, the court concluded that the "defendant, even in the absence of full disclosure, received a fair trial. The court's confidence in the outcome of the jury trial is steadfast." The court concluded similarly with respect to the defendant's sentence. The court relied on the fact that it and the defendant were aware during trial that the sentence was subject to change, as well as the "comprehensive cross-examination" of Mundo by a "veteran trial attorney" that demonstrated that he was "a drug addicted thug from Brooklyn, New York, with a lengthy criminal record." The trial court further noted that "Mundo was subjected to cross-examination about the details of the underlying offenses

however, McWhirter made the court aware of his testimony, and Mariani told the court that he felt Mundo had testified truthfully. The court then told the parties of its intention to take that cooperation into consideration, and to sentence Mundo to less than eight years. It was only at that point that Connelly asked the court not to give Mundo less than six years, which was an offer that had been made to Mundo two years earlier by the court, *Damiani, J.*

charged in this case, his use of a false name when arrested, his concoction of a false story for the police, and his knowledge of firearms."

"Our analysis of the defendant's claim begins with the pertinent standard, set forth in *Brady* and its progeny, by which we determine whether the state's failure to disclose evidence has violated a defendant's right to a fair trial. In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. . . . In *Strickler* v. *Greene*, 527 U.S. 263, [281–82] 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), the United States Supreme Court identified the three essential components of a *Brady* claim, all of which must be established to warrant a new trial: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either willfully or inadvertently; and prejudice must have ensued. . . . Under the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 699–700, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006), discussing *Kyles* v. *Whitley*, 514 U.S. 419, 434–35, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

"A plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*." *State* v. *Floyd*, supra, 253 Conn. 737. With respect to *Brady*'s third prong, "a showing of materiality does not require demonstration by a preponderance that disclosure of

the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . . The United States Supreme Court also emphasized that the [relevant test under *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)] is not a sufficiency of the evidence test. . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. . . . Accordingly, the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 454, 758 A.2d 824 (2000).

Before turning to the record in the present case, we clarify the standard by which we review a trial court's determination that suppressed evidence was not "material" under *Brady*, because our prior cases have not squarely articulated the standard for the appellate review of such claims. Compare, e.g., id., 452–55 (reciting governing legal principles without stating standard of appellate review) with *State* v. *Pollitt*, 205 Conn. 132, 147–49, 531 A.2d 125 (1987) (noting that "the determination of materiality has been said to be 'inevitably fact-bound' and like other factual issues is committed to

the trial court in the first instance," but characterizing trial court's determinations about whether there was " 'reasonable probability' that the result of the trial would have been different," as "conclusions of law," but also recognizing "the difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits such as this; this lack of certitude suggests deference by a reviewing court especially in the weighing of evidence") and *State* v. *Shannon*, 212 Conn. 387, 400, 563 A.2d 646 (citing *Pollitt*, but reviewing trial court's materiality determination for abuse of discretion), cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989).[19] The defendant

[19] In *State* v. *Pollitt*, supra, 205 Conn. 136–37, the defendant raised a *Brady* claim arising from the state's failure to disclose an exculpatory witness statement until mid-trial, and this court remanded that claim to the trial court for an evidentiary hearing. In reviewing the trial court's conclusion that the defendant had not been deprived of his right to a fair trial, despite the suppression of the statement, this court stated that the "determination of materiality has been said to be 'inevitably fact-bound' and like other factual issues is committed to the trial court in the first instance." Id., 147, quoting *United States* v. *Kelly*, 790 F.2d 130, 136 (D.C. Cir. 1986). This court also, however, characterized the trial court's determinations with respect to whether the failure of the state to disclose a witness' allegedly exculpatory statement deprived the defendant of a fair trial, namely, whether there was a " 'reasonable probability' that the result of the trial would have been different," as "conclusions of law." *State* v. *Pollitt*, supra, 148–49. The court's opinion in *Pollitt* also recognized the "difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits such as this; this lack of certitude suggests deference by a reviewing court especially in the weighing of evidence." Id., 149. The court did not, however, articulate precisely the exact standard of review applicable to materiality determinations on appeal.

Thereafter, in *State* v. *Shannon*, supra, 212 Conn. 400, this court cited *Pollitt*, deferred to the factual character of the materiality finding, and concluded that the trial court properly had denied the defendant's motion for a new trial based on a *Brady* violation. In so concluding, the court applied the standard of review applicable to motions for a new trial, and concluded that "the trial court did not abuse its discretion in determining that the impeachment value of the [suppressed] statement was merely cumulative." Id.

Cases from this court and the Appellate Court in the nineteen years following *Pollitt* and *Shannon* have been divergent in their treatment of the applicable standard of review. Some opinions merely state the well established governing legal principles before analyzing the record. See, e.g.,

claims, without any expressed disagreement by the state, that the "determination of materiality is a question of law" subject to plenary review. We agree with the defendant, and join our sister state and federal jurisdictions that have concluded that a trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error.[20] See, e.g., *United States* v. *Zagari*, 111 F.3d

*State* v. *Wilcox*, supra, 254 Conn. 452–55. Other cases cite *State* v. *Pollitt*, supra, 205 Conn. 149, and note that the trial court's materiality determination is fact bound and entitled to some deference, but do not state whether appellate review is plenary, for clear error or for abuse of discretion. See *State* v. *James G.*, supra, 268 Conn. 402–404 (affirming trial court's determination that department of children and families files did not contain *Brady* material, and stating that "we have held that '[t]he determination of materiality . . . [is] inevitably fact-bound and like other factual issues is committed to the trial court in the first instance'"); *State* v. *Ortiz*, 252 Conn. 533, 545–46, 747 A.2d 487 (2000) (citing *Shannon*, but not its abuse of discretion standard, in upholding trial court's determination that suppressed police report was not material); *State* v. *Rasmussen*, 225 Conn. 55, 92, 621 A.2d 728 (1993) (noting deference to trial court's materiality determination with respect to allegedly undisclosed information about telephone calls to defendant's place of business by unidentified caller); see also *State* v. *Jaynes*, 36 Conn. App. 417, 423, 650 A.2d 1261 (1994) (citing *Pollitt* deference with respect to undisclosed police report containing witnesses' contradictory descriptions of gun involved in case), cert. denied, 233 Conn. 908, 658 A.2d 980 (1995). Finally, this court has applied *Shannon*'s abuse of discretion standard only once, in *State* v. *Hammond*, 221 Conn. 264, 294, 604 A.2d 793 (1992), wherein it remanded a *Brady* claim arising from the trial court's denial of a posttrial motion for DNA profiling of untested swabs and smears to the trial court for action in the first instance, concluding that the trial court was entitled to rule first in light of new developments in the then novel area of DNA testing. Id., 294–95. The Appellate Court has, however, cited and relied on *Shannon*'s abuse of discretion standard four times in evaluating trial court assessments of materiality under *Brady*. See *State* v. *Sells*, 82 Conn. App. 332, 351, 844 A.2d 235, cert. denied, 270 Conn. 911, 853 A.2d 529 (2004); *State* v. *Sitkiewicz*, 64 Conn. App. 108, 114, 779 A.2d 782, cert. denied, 258 Conn. 909, 782 A.2d 1250 (2001); *State* v. *St. Pierre*, 58 Conn. App. 284, 294, 752 A.2d 86, cert. denied, 254 Conn. 916, 759 A.2d 508 (2000); *State* v. *Sherman*, 38 Conn. App. 371, 382, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995).

[20] Compare *State* v. *Floyd*, supra, 253 Conn. 737 ("[t]he existence of an undisclosed plea agreement is an issue of fact for the determination of the trial court") with *State* v. *Cobb*, 251 Conn. 285, 358, 743 A.2d 1 (1999) ("The inquiry here is not what happened, based on the evidence presented and

307, 320 (2d Cir.) (court conducts "independent review of a [D]istrict [C]ourt's determination of materiality, which is a mixed question of fact and law"), cert. denied sub nom. *Shay* v. *United States*, 522 U.S. 988, 118 S. Ct. 455, 139 L. Ed. 2d 390 (1997); *State* v. *Marshall*, 148 N.J. 89, 185, 690 A.2d 1 ("[w]hether evidence is material and thus subject to disclosure under the *Brady* rule is a mixed question of law and fact"), cert. denied, 522 U.S. 850, 118 S. Ct. 140, 139 L. Ed. 2d 88 (1997).[21] Because the trial judge had the opportunity, however, to observe firsthand the proceedings at trial, including the cross-examination of Mundo, our independent review nevertheless is informed by his assessment of the impact of the *Brady* violation, and we find persuasive the Second Circuit Court of Appeal's approach of engaging in independent review, yet giving "great weight" to the "trial judge's conclusion as to the effect of nondisclosure on

---

the permissible inferences drawn therefrom. The inquiry here is what would or would not have happened if something that did not happen had happened. We are as qualified as the trial court to evaluate the record and to make that hypothetical determination."), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

[21] See also *People* v. *Salazar*, 35 Cal. 4th 1031, 1042, 112 P.3d 14, 29 Cal. Rptr. 3d 16 (2005) ("[c]onclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim . . . are subject to independent review" [citation omitted]); *Mordenti* v. *State*, 894 So. 2d 161, 170 (Fla. 2004) ("[w]hether evidence is 'material' for *Brady* purposes is a mixed question of law and fact subject to independent review"); *State* v. *Frazier*, 559 N.W.2d 34, 40 (Iowa App. 1996) ("[i]n our de novo review of the case, however, we do not find this evidence was material for *Brady* purposes"); *Pederson* v. *State*, 692 N.W.2d 452, 460 (Minn. 2005) ("because materiality issues under *Brady* combine issues of fact and law, the proper standard of review is de novo"); *Helm* v. *State*, 1 P.3d 635, 639 (Wyo. 2000) ("[i]n the context of a *Brady* challenge, materiality is a mixed question of law and fact, and a reviewing court should conduct an independent examination of the record in determining whether the suppressed evidence is material"); but see *Stewart* v. *United States*, 881 A.2d 1100, 1117 (D.C. 2005) (identifying conflicting standards of review and noting that "[w]hen, as in this case, the trial court has determined that the asserted *Brady* material would not have affected the verdict, we have said that independent review is precluded and that this court need only determine whether the trial court's decision was 'reasonable' "), cert. denied, 547 U.S. 1174, 126 S. Ct. 2348, 164 L. Ed. 2d 859 (2006).

the outcome of the trial . . . ."[22] (Internal quotation marks omitted.) *United States* v. *Zagari*, supra, 320.

Having independently reviewed the record, we conclude that the trial court properly determined that there is no reasonable probability that disclosure of the agreement would have changed the outcome of the proceedings. Our confidence in the overall fairness of the trial and in the jury's verdict has not been undermined, as Mundo's credibility and motives for testifying already had been impeached via defense counsel's comprehensive and skillful cross-examination. Specifically, the jury was exposed to Mundo's ample criminal record spanning nineteen pages, use of aliases, illicit drug use and, most significantly, the facts that he desired a shorter sentence and had not yet been sentenced for his participation in the crimes at issue. Although disclosure of the agreement would have permitted further development of this line of questioning by the defendant's counsel, our review of the record demonstrates that the defendant had impeached Mundo's credibility as extensively and thoroughly during cross-examination as could be expected. Moreover, Mundo's testimony, while significant, was not dispositive; the defendant's own statement to the police, admitted into evidence; see footnote 6 of this opinion; as well as the gloves and

---

[22] Indeed, the Second Circuit's approach in *United States* v. *Zagari*, supra, 111 F.3d 320, is in agreement with our line of cases starting with *State* v. *Pollitt*, supra, 205 Conn. 149, holding that the "difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits such as this; this lack of certitude suggests deference by a reviewing court especially in the weighing of evidence." See also id., 147 ("the determination of materiality has been said to be 'inevitably factbound' and like other factual issues is committed to the trial court in the first instance"). As the defendant points out, however, our decision to engage in plenary review in the present case necessarily renders the line of cases following *State* v. *Shannon*, supra, 212 Conn. 400, and reviewing the trial court's determination that suppressed evidence was not "material" under *Brady* for abuse of discretion; see footnote 19 of this opinion; no longer good law on that point.

matching walkie-talkie found in his car at the scene of the crime, further inculpate him in the planning of, and participation in, the attack on the victim, thus bolstering our confidence in the jury's verdict. Accordingly, the trial court properly concluded that the nondisclosure in this case was not material.

The judgment is affirmed.

In this opinion the other justices concurred.