******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* TYRONE ROSA
## (AC 42267)

Keller, Elgo and Bright, Js.

*Syllabus*

Convicted of the crimes of murder, assault in the first degree and criminal possession of a firearm, the defendant appealed, claiming that the state violated his right to due process when it suppressed DNA evidence that was material to his defense, in violation of *Brady* v. *Maryland* (373 U.S. 83), and did not disclose it until after the jury returned its verdict. The defendant allegedly shot the victims, J and M, in the automobile in which the three were riding after they had left an after-hours club. M subsequently died from his injuries but J was able to flee after he was shot. After the three men left the after-hours club, the defendant told J to park the automobile on the street so the defendant could exit the automobile to urinate. The defendant testified that, while he was urinating by a nearby fence, an unknown person put a gun to his head and told him not to move, yell or turn around. The defendant further testified that he then heard two loud pop sounds. When he turned around one minute later and saw no one, he went back to the automobile and saw that the driver's side door was open. The defendant testified that he did not see anyone inside the automobile or on the street and then ran away. A discarded sweatshirt that the police found in the vicinity of the shootings was sent to the state's scientific laboratory for DNA testing. At the time of trial, DNA from the sweatshirt had not been matched to anyone, including the defendant. Two weeks after the verdict, the prosecutor notified defense counsel that a DNA profile from the sweatshirt had matched a DNA sample that had been collected from a convicted felon, O, whom defense counsel later learned was not incarcerated at the time of the shootings. The defendant claimed that the state had acquired the DNA evidence at least two months before his trial began or while his trial was proceeding, and that it would have discredited the testimony of J, the state's key witness, and bolstered the defense theory that the unknown individual was the shooter. At the defendant's sentencing proceeding, the trial court denied the defendant's motion for a judgment of acquittal. *Held* that the defendant failed to prove that the DNA match between the sweatshirt and O constituted material evidence within the meaning of *Brady*, there having been no reasonable basis to conclude that the lack of the DNA evidence of the match at trial undermined its fairness and resulted in a verdict that was not worthy of confidence: it was reasonable to conclude that the sweatshirt could have been left as a result of innocuous activity, rather than by someone involved in the commission of the shootings, as the defendant did not testify that the alleged unknown gunman was wearing a sweatshirt, which was found more than half a block away from the crime scene in an area that was reasonably likely to be traversed by the public, there was no evidence that indicated how long the sweatshirt had been there, that it was present when the police first responded to the crime scene or that it contained gunpowder residue or blood, and, as there was no indication that O was in the vicinity of the crime scene at the time of the shootings or had any connection to the victims, the defendant would not have been able to successfully raise a third party culpability defense; moreover, even though the defendant was aware of the existence of the sweatshirt at the time of trial and that it did not contain his DNA, it was not necessary for defense counsel to know about the DNA match in order to suggest to the jury that the sweatshirt belonged to someone other than the defendant, bolstering his claim that some unknown person committed the shootings; furthermore, the state's case against the defendant was strong, as it included J's identification of the defendant as the shooter, evidence that the defendant had a motive to kill M when he learned at the after-hours club that M had admitted to the killing the brother of a close friend of the defendant, the defendant's testimony about the events was very weak and lacked credibility, and significant consciousness of guilt evidence implicated

the defendant, as he had lied to the police when they interviewed him and had sought to have friends dispose of his cell phone and visit an area near the crime scene to see if surveillance cameras were present.

Argued October 11, 2019—officially released March 17, 2020

*Procedural History*

Substitute information charging the defendant with the crimes of murder, assault in the first degree and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Baldini, J.*; verdict of guilty; thereafter, the court denied the defendant's motion for a judgment of acquittal and rendered judgment in accordance with the verdict, from which the defendant appealed; subsequently, the court, *Baldini, J.*, granted the defendant's motion for rectification. *Affirmed.*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robin D. Krawczyk*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Tyrone Rosa, appeals from the judgment of conviction, rendered following a jury trial, of one count of murder in violation of General Statutes § 53a-54a, one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (5) and one count of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The defendant claims that the state suppressed evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, the defendant asserts that, either before his trial began or while the trial was ongoing, the state, via its agent, the Department of Emergency Services and Public Protection's division of scientific services (division), acquired evidence that the Combined DNA Index System (CODIS)[1] reported that a DNA profile that was developed from the swabbing of a discarded sweatshirt found in the vicinity of the crime scene matched (CODIS match) a DNA sample collected from a convicted felon, Javier Otero. He asserts that this evidence, which was favorable to him and material for purposes of *Brady*, was not disclosed to the defense until after the jury had returned a guilty verdict. He asserts that this evidence would have bolstered his sole theory of defense that an unknown gunman committed the crimes and also would have discredited the state's key witness. We affirm the judgment of the trial court because we conclude that the defendant has failed to prove that the CODIS match was material to his defense.

On the basis of the evidence presented at trial and the reasonable inferences drawn therefrom, the jury reasonably could have found the following facts. The victims, Dederick "DJ" Jiminez and Hiram "Sito" Martinez, had been close friends since childhood. In 2009, Jiminez became friends with the defendant while the two were incarcerated in the same prison. Jiminez knew the defendant by his nicknames of "Flex" and "Pipone." Jiminez introduced the defendant to Martinez, who began selling drugs with the defendant.

The defendant was friends with Joel "Tuti" Gonzalez, who had a brother named Mariano "Papa" Gonzalez. The defendant claimed to have never met Mariano Gonzalez, but when the police showed the defendant his photograph, the defendant identified him. On December 14, 2014, Mariano Gonzalez was murdered on Bond Street in Hartford, and the police suspected that Martinez was the perpetrator.

On December 20, 2014, Jiminez and Martinez drove in Martinez' tan-colored Honda to an after-hours club on Francis Avenue in Hartford.[2] They arrived between 3 and 4 a.m. and encountered the defendant inside the club. The defendant was there with a close friend, Carlos "Cuz Los" Mangual. At the club, the defendant began

talking to Martinez. Jimenez walked away while Martinez and the defendant continued to talk. After Martinez and the defendant stopped talking, the defendant approached Jiminez and asked him what had happened on Bond Street. Jiminez believed that Martinez had just told the defendant that he was the one who had killed Mariano Gonzalez on Bond Street. Jiminez replied that Mariano Gonzalez "got what he deserved" because he had tried to rob Martinez and had tried to "run up in [Martinez'] house with his family." After hearing this information from Jiminez, the defendant's mood changed. He became quiet and no longer wanted to talk. Jiminez, at that time, was unaware that Joel Gonzalez and Mariano Gonzalez were brothers, although he knew that they were related. He also was unaware of the defendant's friendship with Joel Gonzalez.

At about 5 a.m., as Jiminez and Martinez were leaving the after-hours club, the defendant approached them and asked if they had any cigarettes. When they responded that they did not, he asked them to give him a ride to get some. Jiminez refused because there was no room in the automobile's backseat, which was crowded with his possessions. Upon Martinez' insistence, however, Martinez and Jiminez made room for the defendant in the backseat of the automobile, behind the driver. The defendant got inside of the automobile in the space made for him. Jiminez got into the driver's seat and Martinez got into the front passenger seat.

The defendant directed Jiminez to drive to the residence of the defendant's sister, which was located at the corner of Park Street and Hazel Street. After learning that no one inside of the house had any cigarettes, the defendant directed Jiminez to drive to a twenty-four hour convenience store at Park Street and Broad Street. When the three men arrived at the store, however, the defendant refused to go inside, insisting that Martinez go inside instead. Martinez refused, and he and the defendant argued until Jiminez got out of the car, went inside the store, and purchased cigarettes. After Jiminez purchased the cigarettes, the defendant directed him to drive to Hendricxsen Avenue. When they arrived at Hendricxsen Avenue, adjacent to a vacant lot, the defendant told Jiminez to park the automobile because he needed to urinate. Jiminez complied and parked the automobile close to the street corner at which Hendricxsen Avenue and Masseek Street meet, and the defendant exited the automobile.

Initially, Jiminez could not see where the defendant went because the defendant had left the automobile door open, which caused the interior dome light to remain on and obscure his view of the defendant. Once Jiminez had closed the door, however, he saw the defendant standing behind the automobile, by a fence. Jiminez heard the defendant talking on his cell phone as he returned to the automobile. Once he was back inside

the automobile, the defendant asked Jiminez and Martinez if they wanted to go to the home of one of his friends and have a few drinks. Both of them agreed.

As he waited for directions from the defendant to the friend's house, Jiminez checked his cell phone. He suddenly heard a loud bang from the backseat of the automobile. Stunned by the loudness of the bang, he brought his hands up to his ears and ducked down. He then felt his right arm fall to his side and realized that his arm did not feel right. He opened the driver's side door, got out of the automobile and ran. While running, he looked back and saw only the defendant standing outside of the automobile. He did not see Martinez exit the automobile and did not see anyone else on the street.

Jiminez ran through a vacant lot, toward a building located at 62 Hendricxsen Avenue. A woman inside the building yelled to him that she was coming downstairs to open the door. Jiminez went inside and lay down on the steps. The woman called 911.

At approximately 5:40 a.m., Hartford Police Officer Christopher White was dispatched to 62 Hendricxsen Avenue, where he found Jiminez in the stairwell, bleeding and holding his shoulder. At approximately 5:41 a.m., Hartford Police Officer Matthew Steinmetz was dispatched to the area of Hendricxsen Avenue and Masseek Street on a report of a shooting and a victim inside a tan Honda. Steinmetz found the engine of the tan Honda running and Martinez slumped over the center console with a gunshot wound to the back left side of his head. He did not see any other people in the area.

Martinez later was pronounced dead as a result of the gunshot wound that he had sustained to his head. Jiminez, who had been shot twice, underwent surgery to repair gunshot wounds to his shoulder and elbow. Physicians were unable to remove the bullet that was lodged in his shoulder without risking greater damage and had to place permanent plates and rods in his elbow, which had shattered. After surgery, Jiminez told the police that the defendant, whom he called "Pipone," had shot him. He gave a description of "Pipone" that matched the defendant's appearance at the time of the shooting. Later, he gave a written statement to the police and selected the defendant's photograph from a sequential photographic array. Hartford police lifted the defendant's fingerprint from the interior handle of the rear door on the driver's side of the automobile, next to the seat where Jiminez had said the defendant was sitting when he fired the gun.

After leaving the after-hours club, Mangual could not find the defendant and repeatedly tried to call him. It was not until 5:36 a.m. that the defendant answered his phone. The defendant told Mangual to pick him up. Thereafter, Mangual picked up the defendant on Ston-

ington Street in Hartford, which is near Hendricxsen Avenue, where the shootings occurred, and is separated from the scene of the crimes only by a vacant lot with a path running through it. Portions of the path are horseshoe shaped. When Mangual arrived to pick up the defendant, the defendant told him that he "almost got shot."

After their initial investigation, the Hartford police suspected that the defendant had some involvement in the shooting of Jiminez and Martinez. At the request of the police, on December 31, 2014, the defendant was taken into custody by his parole officer and transported to the Hartford Police Department, where he consented to be interviewed. He provided the police with a fake cell phone number and falsely denied that one of his nicknames was "Flex." The police found a public Facebook profile for the defendant that reflected his use of that nickname. Although the defendant admitted that he knew Joel Gonzalez, he falsely denied associating with him. The defendant's cell phone records, which later were seized by the police, revealed that the defendant called Joel Gonzalez' phone fifty-one times between December 16 and December 20, 2014. The police also found an online video in which the defendant stated to Joel Gonzalez that he loved him and would die for him. The defendant admitted to the police that he was at the same after-hours club as Jiminez and Martinez on the morning of the shooting. He indicated, however, that although he had gotten into a gold automobile with them and had sat behind the driver's seat, he had not been driven anywhere in the automobile with them that morning. He told the police that after he left the after-hours club, he walked to the area of Capitol Avenue and Rowe Avenue in Hartford to visit a woman, but he could not provide the police with her name.[3]

During the interview, Hartford Police Detective Daniel R. Richter told the defendant that cell towers help the police track people's movements via their cell phones. After Richter made this statement to the defendant, Officer Luis Colon of the Department of Correction listened to and recorded a phone call the defendant made the very next day from prison to Joel Gonzalez, in which he instructed Joel to make sure that Mangual destroyed his cell phone "because of [cell] towers." Colon also listened to and recorded another call from the defendant to Joel Gonzalez on February 18, 2015, the day on which the defendant was arrested on the charges in this case. During that phone conversation, the defendant directed Joel Gonzalez to "take a trip down memory lane," go around the "horseshoe," and "go make sure that within that trail there's nothing [there] . . . . But if you seen that trail and cheese, I see you," make sure that there are no "cheese, I see you." The defendant's statement was significant evidence of his involvement in the crimes because there

was a horseshoe shaped area close to the shooting scene and "cheese, I see you" is code for a surveillance camera. Thereafter, Richter returned to the area near the crime scene and checked several horseshoe shaped areas but did not find any additional evidence.

The defendant testified at trial. His testimony concerning the events that occurred on the morning of December 20, 2014, was markedly different from the information that he previously had relayed to law enforcement personnel. He testified that, while he was standing at the fence at Hendricxsen Avenue and urinating, an unknown person put a gun to his head and told him not to move, yell or turn around. He stated that he then heard two loud "pops," a car door open and close, and a whistle. One minute later, he turned around, and, seeing no one, went back to the automobile. He saw that the driver's door was open but did not see anyone inside or on the street and so he ran away. The defendant admitted that he never told anyone about the presence of this unknown gunman prior to his trial testimony. He claimed that he did not do so and that he lied to the police during his interview because he did not want his parole violated. He also admitted that he did not testify to this version of events during his parole revocation hearing.[4]

After approximately two and one-half days of deliberation, the jury found the defendant guilty of murder, assault in the first degree and criminal possession of a firearm. The trial court denied the defendant's postverdict motion for a judgment of acquittal, rendered judgment of conviction, and sentenced him to seventy years of incarceration. Additional facts and procedural history will be set forth as necessary.

The defendant's sole claim on appeal is that the state, through its agent, the division,[5] suppressed evidence favorable to him and material to his guilt or innocence, namely, evidence of the CODIS match indicating that the DNA of another convicted felon was found on a discarded sweatshirt in the vicinity of the scene of the shootings. He alleges that the division acquired this key evidence either at least two months before his trial began or while his trial was proceeding, and did not disclose it until after his trial had concluded. He asserts that evidence belonging to a convicted felon, found near the crime scene, would have bolstered his sole theory of defense—that an unknown individual was the shooter—and discredited the state's key witness, Jiminez. He maintains that because the outcome of the trial hinged on whether the jury believed him or Jiminez with respect to the identity of the shooter, the failure to disclose the CODIS match for nearly two weeks after the verdict violated his right to due process under the United States constitution[6] and cast doubt on the fairness of his trial.

The state counters that the defendant's *Brady* claim

was waived when his trial counsel chose to pursue a postjudgment motion for a judgment of acquittal rather than properly raise his *Brady* claim by filing a motion for a new trial, although he had a fair opportunity to do so. Alternatively, the state, mainly focusing on the issue of whether the evidence of the CODIS match had been suppressed, argues that the record is inadequate for this court to review the defendant's unpreserved *Brady* claim under the rule in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Finally, the state contends that if the defendant's *Brady* claim is reviewable, it fails on its merits because the defendant failed to prove that (1) the division suppressed favorable evidence regarding the CODIS match and (2) the CODIS match constitutes material evidence. We agree with the state that the defendant has failed to prove that the newly disclosed evidence of the CODIS match was material and, therefore, affirm the judgment of the trial court.

The following additional facts and procedural history are relevant to the defendant's claim. At trial, Detective Jason Lee testified that, on December 23, 2014, he was working for the Hartford Police Department's crime scene division, which processes crime scenes. His main function was to process the crime scene by taking photographs and collecting and preserving evidence. At approximately 11:43 a.m. on December 20, 2014, he was called to process a murder scene in the area of Hendricxsen Avenue and Masseek Street. While there, the lead detective in the case, Richter, who had arrived on the scene at approximately 7:47 a.m., alerted him to "potential evidence" on a street "kind of . . . nearby" the crime scene and south of it. Lee "tried" to photograph his "way down there to . . . show perspective" and then photographed two items, a sweatshirt and a pair of sweatpants in that area. Lee testified that the sweatshirt was on the "southeast corner of the intersection of Hendricxsen Avenue and Curcombe Street," by a sidewalk and a fence near "an apartment complex." He saw the sweatpants behind a telephone pole as "you headed east on Curcombe . . . ." After photographing the items, he seized them. The sweatshirt and sweatpants were processed and sent to the division for testing.

The defendant's trial ended on February 14, 2017. On April 4, 2017, the date of the defendant's sentencing, the court began the proceeding by stating on the record that a meeting had just taken place with counsel in chambers to go over what "we were going to do today. During that conversation, there was some information provided to the court." The court did not indicate the nature of this information. Defense counsel then indicated that he wanted to address one issue before sentencing. He stated on the record that, on February 27, 2017, almost two weeks after the jury returned its ver-

dict, the prosecutor had e-mailed him, stating that she had been notified by the division of a "CODIS hit" between Otero and the sweatshirt recovered from the corner of Hendricxsen Avenue and Curcombe Street. Defense counsel explained that "there was some DNA taken from a sweatshirt" for testing, and that, "[a]t the time of [the defendant's] trial," the DNA had not been matched to anyone, including the defendant. Defense counsel indicated that, after he received the e-mail from the prosecutor, he did some research and learned that Otero had not been incarcerated at the time of the crimes and, thus, "potentially," could have been a suspect in this case. He further stated that the "information was not available to anyone" and was "not insinuating" that the state had engaged in any "subterfuge" with regard to it. Defense counsel then noted that, after the prosecutor had alerted him to the CODIS match and its potential value, he did research and consulted with several attorneys about how to proceed. Referring to Practice Book § 42-51, which governs motions for a judgment of acquittal,[7] and Practice Book § 42-53, which governs motions for a new trial,[8] defense counsel orally made "a motion for [a] judgment of acquittal . . . based on new evidence."

Defense counsel then stated that he knew that the court was "aware of the fact that there is some information that may [have] changed the balance of the case, and I would ask for the court to allow me to advance the argument and to grant that motion. And there's—there's certain remedies; I think, you could overturn or set aside the verdict, or you could grant a new trial . . . it's within your discretion." Defense counsel then advised the court that it would be his plan to go through with the sentencing if the court denied his motion and that the next stage would be to file a petition for a new trial, which was the "proper mechanism" for raising his concerns under Practice Book § 42-55[9] and General Statutes § 52-270 (a).[10] He concluded by asserting that he had just made, "fairly, a complete record," and asked the court to rule on the motion.

The prosecutor responded that the standard for granting a motion for a judgment of acquittal, as set forth in Practice Book § 42-51, had not been met because the admitted evidence, which included Jiminez' eyewitness testimony that the defendant shot both him and Martinez, fully and reasonably supported the jury's verdict. The prosecutor did not address the defendant's request for a new trial.

The court then stated that, "in the interest of justice," it would entertain the defendant's late motion for a judgment of acquittal "under Practice Book §§ 42-51 and 42-52" because it had had some advance notice from defense counsel that he would be making an oral motion, and it had reviewed its notes, some of the testimony, "the information that was presented," and

the law pertaining to postverdict motions for a judgment of acquittal. The court did not indicate that it was considering a motion for a new trial pursuant to Practice Book § 42-53. The court then denied the motion for a judgment of acquittal, specifically stating that it had considered the "information that was conveyed to the state's attorney's office, which was subsequently provided to defense counsel with regard to some evidence that was discussed at this trial" in light of the evidence presented in this case. It then proceeded to sentence the defendant.

Our review of the proceedings before the trial court on the defendant's oral motion for a judgment of acquittal or a new trial leads us to conclude that no claim of a *Brady* violation ever was advanced to the trial court by the defendant's trial counsel. Rather, defense counsel explicitly stated that he had been made aware of newly discovered evidence, and that neither the prosecution nor the defense were at fault for the postverdict timing of this disclosure. Without introducing any documentation or other evidence, he made an argument that an acquittal or a new trial was justified on the basis of newly revealed information concerning the CODIS match, which apparently had been discussed earlier with the court in chambers, but made no legal argument that would have alerted the court that he was making a *Brady* claim.

The state, in opposing the defendant's motion, apparently did not perceive that defense counsel was making a claim of untimely disclosure under *Brady*. Rather, the state argued that the defendant had not met the standard for the granting of a motion for a judgment of acquittal. Defense counsel made no rebuttal argument indicating that his claim was of a different nature. In denying the motion for a judgment of acquittal, the court did not set forth any factual findings or legal conclusions that, in any way, addressed the essential components of a *Brady* claim. As we will discuss in greater detail, "[i]n order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State* v. *Dixon*, 72 Conn. App. 852, 858, 806 A.2d 1153, cert. denied, 262 Conn. 926, 814 A.2d 380 (2002).[11]

After filing the present appeal, appellate counsel for the defendant filed a motion for rectification of the record and requested that three documents that were referenced as "information" during the hearing on his motion for a judgment of acquittal or a new trial be marked as court exhibits, as they were the basis for his unpreserved *Brady* claim and necessary to his appeal. He indicated in the motion for rectification that there had been a conversation in chambers on April 4,

2017, and that some information had been provided to the court. That information, he claimed, was disclosed by the state in its February 27, 2017 e-mail to defense counsel. He alleged that the three documents contained "critical facts," which were not otherwise in the record, in support of his *Brady* claim. These facts included the dates on which (1) Otero was incarcerated, (2) Otero's DNA sample was taken and (3) the division, the state's investigative agent, matched the DNA from the sweatshirt to Otero's DNA and provided notice of this result to the Hartford police and the Hartford state's attorney's office. Those three documents, which were appended to the defendant's motion for rectification, were: (1) a printout of the February 27, 2017 e-mail from the state to defense counsel, in which it disclosed the CODIS hit; (2) the offender hit notification form, dated February 23, 2017, that the division sent to the Hartford and New Britain police departments and the Hartford state's attorney's office, informing them of the CODIS hit; and (3) an inmate information sheet from the Department of Correction regarding the incarceration of Otero. On September 12, 2018, the trial court granted the motion for rectification and marked the three documents as court exhibits.[12] The court stated that the page number designations at the bottom of the documents were not there at the time of its initial discussion and review of the documents, but that they were otherwise "what [the] court recollect[ed] [were] discussed in this matter previously."[13] The defendant sought no further augmentation of the record.

As previously discussed, in this case, the record reveals that defense trial counsel never argued, and the trial court never considered, a *Brady* claim. Therefore, the defendant's *Brady* claim is unpreserved, a fact the defendant concedes in his reply brief, wherein he first asserts that his claim is subject to review under *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781, yet falls short of affirmatively requesting such review. Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim." (Internal quotation marks omitted.) *State* v. *Jerrell R.*, 187 Conn. App. 537,

543, 202 A.3d 1044, cert. denied, 331 Conn. 918, 204 A.3d 1160 (2019).

An affirmative request for review under *Golding* is not a prerequisite for review. See *State* v. *Elson*, 311 Conn. 726, 754–55, 91 A.3d 862 (2014) (to obtain *Golding* review of unpreserved claim, defendant need only raise claim in main brief, present adequate record for review and affirmatively demonstrate that claim seeks to vindicate fundamental constitutional right). The defendant's claim is reviewable under *Golding* because the record is adequate for review and, in his main brief, he has alleged a violation of his constitutional right to due process and provided analysis of his claim. Therefore, pursuant to *Golding*, we will proceed to examine the defendant's unpreserved claim that the state committed a *Brady* violation by failing to disclose the CODIS match.

"Our analysis of the defendant's claim begins with the pertinent standard, set forth in *Brady* and its progeny, by which we determine whether the state's failure to disclose evidence has violated a defendant's right to a fair trial. In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. . . . In *Strickler* v. *Greene*, 527 U.S. 263, [281–82] 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), the United States Supreme Court identified the three essential components of a *Brady* claim, all of which must be established to warrant a new trial: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either [wilfully] or inadvertently; and prejudice must have ensued. . . . Under the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 699–700, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006), discussing *Kyles* v. *Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). "If . . . [the defendant] . . . fail[s] to meet his burden as to [any] one of the three prongs of the *Brady* test, then [the court] must conclude that a *Brady* violation has not occurred." *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 296, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

In setting forth his claim on appeal, the defendant does not claim that an error was committed by the trial court. As we have discussed previously, the defendant

moved for rectification to have certain documents made part of the record so that he could raise this *Brady* claim for the first time on appeal, and he maintains that the record, as rectified, renders his claim adequate for review.[14] Stated otherwise, the defendant relies solely *on the facts in the record* to demonstrate that a *Brady* violation occurred and, thus, he was deprived of a fair trial.

With respect to the record, we observe that "[o]ur Supreme Court has clarified that [a] record is not inadequate for *Golding* purposes because the trial court has not reached a conclusion of law if the record contains the factual predicates for making such a determination. . . . Nevertheless, [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Morales*, 164 Conn. App. 143, 167, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016). Although the parties dispute whether the late disclosed CODIS match is favorable to the defense and whether it was suppressed by the division, they do not dispute the nature of the late disclosed evidence or where it was located. A sweatshirt was found approximately one-half to three-quarters of a block away from the car in which the shootings occurred. After the sweatshirt was tested for DNA, a CODIS match to Otero, who was not incarcerated at the time of the shootings, was generated. In the present case, we are being asked by the defendant to reach a legal conclusion that the trial court had not been asked to address, on the basis of an undisputed factual record that we deem adequate for review of the *Brady* claim as framed by the defendant in this appeal. See *State* v. *Torres*, 230 Conn. 372, 379, 645 A.2d 529 (1994). On the basis of the record demonstrating these facts and, assuming, without deciding, that this evidence is favorable to the defense and was suppressed, we are able to dispose of the defendant's *Brady* claim by addressing only the materiality prong.[15]

Next, we turn to the standard by which we review materiality in the context of a *Brady* analysis. We rely on the standard set forth in *State* v. *Ortiz*, 280 Conn. 686, 718–22, 911 A.2d 1055 (2006), in which our Supreme Court "clarified" the standard for review of materiality in a *Brady* claim because it determined that prior cases had not squarely articulated one.[16]

The court in *Ortiz* joined sister state and federal jurisdictions that have concluded that a trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error. Id., 720. Our Supreme Court,

however, also expressed a preference for providing the trial judge with the opportunity to first consider a *Brady* claim, as the trial judge has observed firsthand the proceedings at trial, and it indicated that its "independent review nevertheless is informed by [the trial judge's] assessment of the impact of the *Brady* violation . . . ." Id., 721–22. The court explained: "[W]e find persuasive the Second Circuit Court of [Appeals'] approach of engaging in independent review, yet giving 'great weight' to the 'trial judge's conclusion as to the effect of nondisclosure on the outcome of the trial . . . .'" Id., quoting *United States* v. *Zagari*, 111 F.3d 307, 320 (2d Cir.), cert. denied sub nom. *Herzog* v. *United States*, 522 U.S. 983, 118 S. Ct. 445, 139 L. Ed. 2d 381 (1997), and cert. denied sub nom. *Shay* v. *United States*, 522 U.S. 988, 118 S. Ct. 455, 139 L. Ed. 2d 390 (1997).

Despite our Supreme Court's preference to first have the trial court assess the impact of a *Brady* violation, we do not interpret this stated preference as an inviolable rule that any *Brady* claim must first be fully presented and preserved in the trial court or be deemed waived. That would be a derogation of defendants' rights under *Golding*. This court has reviewed unpreserved *Brady* claims under *Golding* when there was no dispute as to the nature of the allegedly suppressed evidence. For example, in *State* v. *Bryan*, 193 Conn. App. 285, 219 A.3d 477, cert. denied, 334 Conn. 906, 220 A.3d 37 (2019), despite the fact that the trial court did not adjudicate the specific issue of whether the state committed a *Brady* violation by failing to disclose certain internal affairs records of a police department, this court determined that no additional proceedings under *State* v. *Floyd*, 253 Conn. 700, 730–32, 756 A.2d 799 (2000), were necessary. *State* v. *Bryan*, supra, 313; see footnote 14 of this opinion. It proceeded to examine the defendant's unpreserved *Brady* claim, noted that the state conceded that certain records had not been disclosed, and then assumed, without deciding, that the internal affairs records were favorable to the defendant as impeachment evidence against one of the testifying police officers.[17] Id., 316. Addressing only the materiality prong, the court in *Bryan* concluded that there was no *Brady* violation because the records were not material to the outcome of the defendant's trial and, thus, the state's late disclosure did not run afoul of *Brady*. Id.; see also *State* v. *Bethea*, 187 Conn. App. 263, 280–82, 202 A.3d 429 (conducting *Golding* review of unpreserved *Brady* claim by assuming evidence was favorable to defense, reviewing transcript of pretrial hearing, and finding, based on transcript, that defendant had equal access to witness to obtain statement and, thus, there was no evidence of suppression), cert. denied, 332 Conn. 904, 208 A.3d 1239 (2019).[18]

Having resolved the issues of reviewability that pertain to the claim before us, we turn to the merits of the claim under *Golding*. "Not every failure by the state to

disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material." (Internal quotation marks omitted.) *Gaskin* v. *Commissioner of Correction*, 183 Conn. App. 496, 529–30, 193 A.3d 625 (2018). Under the last *Brady* prong, the evidence must have been material to the case, such that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* v. *Whitley*, supra, 514 U.S. 435. The mere possibility that the undisclosed information might have helped the defense or might have affected the outcome of the trial does not meet the materiality standard. See *State* v. *Pollitt*, supra, 205 Conn. 149. For the reasons that follow, we conclude that, even assuming that the state suppressed favorable evidence, the defendant has failed to show that the evidence the state allegedly suppressed was material.

In deciding whether the defendant has met his burden on the materiality prong, this court views the undisclosed favorable evidence, "not . . . in a vacuum . . . [but] in the context of all the evidence introduced at trial." (Internal quotation marks omitted.) Id., 143. "[E]vidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Internal quotation marks omitted.) *Smith* v. *Commissioner of Correction*, 141 Conn. App. 626, 639, 62 A.2d 554, cert. denied, 308 Conn. 947, 67 A.3d 290 (2013). The favorable evidence must cast the whole case in a different light. It is not enough for the defendant to show that the undisclosed evidence would have allowed the defense to weaken or destroy a particular prosecution witness or item of evidence to which the undisclosed evidence relates. See *Kyles* v. *Whitley*, supra, 514 U.S. 460 (Scalia, J., dissenting). When the evidence admitted at trial strongly supports the defendant's guilt, it is less likely that the undisclosed evidence would undermine confidence in the verdict. See, e.g., *State* v. *Dupigney*, 295 Conn. 50, 73, 988 A.2d 851 (2010).

In this case, the defendant failed to prove that the CODIS match constituted material evidence. The defendant did not testify that the alleged unknown gunman was wearing a sweatshirt, and the sweatshirt was not found at the actual crime scene but more than half a block away[19] at the corner of Hendricxsen Avenue and Curcombe Street. There is no evidence to indicate how long the sweatshirt had been there or that it was even present when the police first responded to the crime scene. There is no indication that the sweatshirt contained any signs of gunpowder residue or blood. Rich-

ter, who did not arrive at the crime scene until 7:43 a.m. on the morning of December 20, 2014, testified at trial that he alerted Lee to the sweatshirt. As depicted in photographs taken by Lee near the crime scene, the sweatshirt was found next to a sidewalk and in front of a fence surrounding an apartment complex, an area that is reasonably likely to be traversed by the public.

We are guided in our analysis by our Supreme Court's analysis in *State* v. *Dupigney*, supra, 295 Conn. 50, in which the petitioner, who had been convicted of murder, sought postconviction forensic DNA testing of a hat that was found on a driveway near the crime scene and had been introduced into evidence at his criminal trial. In *Dupigney*, the state had presented evidence at trial that the shooter had been wearing a hat. Id., 70. In order to be entitled to postconviction DNA testing of evidence, the petitioner, pursuant to General Statutes § 54-102kk (b) (1), had to demonstrate a reasonable probability that he "would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing . . . ." The trial court denied the petition. *State* v. *Dupigney*, supra, 53. On appeal, our Supreme Court, applying the reasonable probability standard under § 54-102kk, found that the possibility that DNA testing of the hat could show that biological material from the hat belonged to neither the victim nor the petitioner would not create a reasonable probability that the jury could have formed a reasonable doubt that the petitioner was the shooter. Id., 73. In making its decision, the court noted that the term "reasonable probability" has a well established meaning—"a probability sufficient to undermine confidence in the outcome"—in the context of postconviction challenges, generally, including the *Brady* line of cases governing postconviction challenges on the basis of prosecutorial failure to disclose evidence to an accused. (Internal quotation marks omitted.) Id., 60–61. Accordingly, it applied the *Brady* materiality standard to its determination of whether the petitioner had shown sufficient cause to obtain postconviction DNA testing of the hat. Id., 64. In other words, the question that was addressed by the court in *Dupigney* was whether confidence in the outcome of the petitioner's trial would be undermined if the results of testing on the hat were to reveal the presence of DNA that matched neither the petitioner nor the victim. After noting the generic nature of the black knit hat found approximately twenty-two feet from the scene of the crime and the fact that the state never argued that the shooter had worn that particular hat, the court ruled that the link between the hat recovered in the driveway and the hat worn by the shooter was inconclusive. Id., 71–72. In light of the strong evidence, entirely unrelated to the hat, identifying the petitioner as the shooter, the court determined that even if biological material could be found on the hat that did not belong to the petitioner or the victim, it would

not undermine confidence in the fairness of the guilty verdict. Id., 72–73.

In the present case, the connection between the sweatshirt and the crimes is even more tenuous than the connection between the black knit hat and the crime in *Dupigney*. Specifically, the sweatshirt was found farther away from the crime scene, and the defendant did not testify that the alleged unknown shooter was wearing a dark colored sweatshirt.

Furthermore, in the present case, although defense counsel provided documentation to the trial court that Otero was not in prison at the time of the crimes, there is no indication that he was in the vicinity of the crime scene on or about December 20, 2014, or that he had any connection to the victims, let alone a motive to harm them. Without a clear link between Otero and the crimes, the defendant would not have been able to successfully raise a third-party culpability defense, assigning blame to Otero. In the absence of other evidence that connected Otero to the crime, it is reasonable to conclude that the sweatshirt at issue, which was located more than half a block from the crime scene, could have been left as a result of innocuous activity, rather than by someone involved in the commission of the shootings. See *State* v. *Gray-Brown*, 188 Conn. App. 446, 474, 204 A.3d 1161 (evidence of partial fingerprint of third person on vehicle victim was driving at time of robbery raised only bare suspicion that third party committed crime and was not relevant to jury's consideration; defendant needs to demonstrate direct connection between third party and crimes to warrant giving third-party culpability instruction to jury), cert. denied, 331 Conn. 922, 205 A.3d 568 (2019).

Even though, at the time of the trial, defense counsel did not know of the CODIS match, which linked Otero to the sweatshirt, he nonetheless was aware of the existence of the sweatshirt and the fact that it did not contain the defendant's DNA. In fact, in closing argument, defense counsel argued to the jury that it should question why it had heard nothing from the state about evidence found at or near the crime scene, but which testing revealed not to belong to the defendant. Defense counsel referred to the sweatshirt, fingerprints, and a cigarette butt. Obviously, it was not necessary for defense counsel to know about the CODIS match to suggest to the jury that the sweatshirt found up the street near the scene of the crimes belonged to someone other than the defendant in order to bolster his claim that some unknown person committed the shootings. He could have cross-examined Richter, who testified that the sweatshirt revealed no useful evidence, in more depth and asked him to explain in detail what forensic analysis, if any, the state had performed and, specifically, whether the division had created a DNA profile from a swabbing of the sweatshirt, whether that profile

was compared to the defendant's DNA profile, and what the results were. See *United States* v. *Alston*, 899 F.3d 135, 147 (2d Cir. 2018) (to extent that defendant argues exculpatory testimony was material because it bolstered his reasonable perception that third party was legitimate businessman, defendant had opportunity to make that argument to jury through evidence already admitted, specifically, third party's trial testimony), cert. denied,      U.S.      , 139 S. Ct. 1282, 203 L. Ed. 2d 292 (2019).

Although the defendant places great weight on the fact that Otero was a convicted felon, Otero's felony conviction was for larceny in the second degree, not for a violent crime. If Otero's felony history presumes a propensity to commit the crimes in this case, the same could be said of the defendant's criminal history, for he admitted in his testimony that he had several prior felony convictions, several for larceny.

Viewing the evidence as a whole, the state's case against the defendant was strong. It included Jiminez' eyewitness identification of the defendant, a person with whom he was familiar, as the shooter. Jiminez also testified that he exited the car immediately after being shot and ran in the direction of the apartment building in front of which the sweatshirt was discarded but that he saw no one else except the defendant in the area.

There also was evidence of a motive. The jury reasonably could have found that the defendant's mood at the after-hours club suddenly changed when he became aware that Martinez had admitted to killing Mariano Gonzalez, and the defendant was very close with Mariano Gonzalez' brother, Joel Gonzalez. The defendant himself testified that he had vouched for Martinez with the Los Solidos gang after Martinez had said the gang suspected him of killing someone.[20]

There also was significant consciousness of guilt evidence implicating the defendant. There was evidence that he repeatedly lied to the police during his interview with them, by giving an incorrect number for his cell phone and by denying that one of his nicknames was Flex, that he associated with Joel Gonzalez, and that he drove anywhere with Jiminez and Martinez on the night of the shootings. There was evidence that he called Joel Gonzalez to ask him to tell Mangual to get rid of the defendant's cell phone after the police told him they could track phone locations via cell towers. He also called Joel Gonzalez a second time to ask him to go to an area close to the crime scene, the "horseshoe," to see if there were any surveillance cameras present.

Particularly damaging to the defendant's testimony that an unknown gunman was the perpetrator was his admission on cross-examination that he previously did not describe that version of events when he was inter-

viewed by the police or when it would have behooved him to do so at his parole revocation hearing, which resulted from his having violated his parole by committing the crimes in this case. His testimonial version of the events that transpired also lacks credibility in certain areas. As a matter of logic, certain unanswered questions undermine the defendant's version of events. For example, how could he look into the car when the driver's side door was open and not see the dying, or already deceased, Martinez slumped over the front console? And, why would he have told his friend, Mangual, who picked him up near the crime scene early that morning, only that he "almost got shot," and why wouldn't the defense have asked Mangual, on cross-examination, to corroborate that conversation?

There was strong evidence inculpating the defendant, including the eyewitness testimony of Jimenez, the evidence that he had a motive to commit the crimes, and evidence that he was conscious of his guilt. Although the defendant presented his own testimony concerning an unknown shooter, a version of events that he did not previously relate to the police or to parole officials, such evidence was very weak. Additionally, the jury was made aware of the fact that a sweatshirt and a pair of sweatpants had been discovered near the crime scene but that these items were not connected to the defendant. Also, the defendant is unable to demonstrate any actual connection between Otero and the victims in this case. On the basis of the foregoing, there is no reasonable basis to conclude that the lack of the evidence of the CODIS match during the defendant's trial undermined its fairness and resulted in a verdict not worthy of confidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See, e.g., *State* v. *Webb*, 128 Conn. App. 846, 852–83 n.3, 19 A.3d 678 (generally describing national CODIS database), cert. denied, 303 Conn. 907, 32 A.3d 961 (2011).

[2] Jiminez described the after-hours club as a "place where people go after the clubs are closed down."

[3] During his trial testimony, the defendant admitted that he had fabricated much of the information he gave the police during their interview of him, including his statements about his association with Joel Gonzalez and about not driving anywhere with Jiminez and Martinez in Martinez' car after he left the after-hours club on December 20, 2014.

[4] In fact, when the defendant began referring to his encounter with an unknown gunman on Hendricxsen Avenue, the prosecutor declared she was surprised and had not been given any notification that the defendant was going to assert a third-party culpability defense.

[5] The state concedes that it sent the sweatshirt that was seized to the division for DNA testing and is not contesting agency for purposes of this appeal. See *State* v. *Guerrera*, 331 Conn. 628, 631, 206 A.3d 160 (2019) (when Department of Correction acts as investigative arm of state in conducting review of inmate phone calls at behest of prosecutor as part of state's investigation into criminal case, such calls are subject to disclosure requirements of *Brady*); *Stevenson* v. *Commissioner of Correction*, 165 Conn. App. 355, 367–68, 139 A.3d 718 (whether individual or agency is "arm of the prosecution," does not turn on status of person or agency but on what they did—i.e., whether they worked in conjunction with police or prosecutor and whether they actively assisted in investigation of crime), cert. denied,

322 Conn. 903, 138 A.3d 933 (2016).

[6] Although the defendant also claims a due process violation under our state constitution; see Conn. Const., art. I, § 8; he does not provide a separate analysis thereunder or argue that the Connecticut constitution provides greater protection than the federal constitution. Accordingly, review of his claim is limited to the federal constitution. See *State* v. *Ortiz*, 280 Conn. 686, 689 n.2, 911 A.2d 1055 (2006).

[7] Practice Book § 42-51 provides in relevant part: "If the jury returns a verdict of guilty, the judicial authority, upon motion of the defendant . . . shall order the entry of a judgment of acquittal as to any offense specified in the verdict, or any lesser included offense, for which the evidence does not reasonably permit a finding of guilty beyond a reasonable doubt. If the judicial authority directs an acquittal for the offense specified in the verdict, but not for a lesser included offense, it may either:

"(1) Modify the verdict accordingly; or

"(2) Grant the defendant a new trial as to the lesser included offense."

Practice Book § 42-52 provides in relevant part: "Unless the judicial authority, in the interests of justice, permits otherwise, a motion for a judgment of acquittal shall be made within five days after a . . . verdict . . . ."

[8] Practice Book § 42-53 provides in relevant part: "(a) Upon motion of the defendant, the judicial authority may grant a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his or her asserting the error, the judicial authority shall grant the motion:

"(1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or

"(2) For any other error which the defendant can establish was materially injurious to him or her. . . ."

[9] Practice Book § 42-55 provides: "A request for a new trial on the ground of newly discovered evidence shall be called a petition for a new trial and shall be brought in accordance with General Statutes § 52-270. The judicial authority may grant the petition even though an appeal is pending."

[10] General Statutes § 52-270 (a) provides: "The Superior Court may grant a new trial of any action that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the action to any defendant or of a reasonable opportunity to appear and defend, when a just defense in whole or part existed, or the want of actual notice to any plaintiff of the entry of a nonsuit for failure to appear at trial or dismissal for failure to prosecute with reasonable diligence, or for other reasonable cause, according to the usual rules in such cases. The judges of the Superior Court may in addition provide by rule for the granting of new trials upon prompt request in cases where the parties or their counsel have not adequately protected their rights during the original trial of an action."

In his brief, the defendant indicates that no petition for a new trial has been filed.

[11] In its brief, the state argues that the defendant waived his *Brady* claim when defense counsel had a fair opportunity to raise a *Brady* claim and made a strategic decision not to pursue one. We decline to construe the argument of defense counsel, in seeking a judgment of acquittal or a new trial on the basis of what he characterized as "newly discovered evidence," rather than suppressed evidence, as a knowing and intelligent waiver of a possible *Brady* claim. On the basis of our review of the record, we are not convinced that defense counsel realized that he may have had the factual requisites to raise a *Brady* claim.

[12] The court marked the February 27, 2017 e-mail to defense counsel from the prosecutor, the February 23, 2017 offender hit notification form from the division, and the Department of Correction information sheet concerning Otero as court exhibits one through three, respectively. To avoid confusion with court exhibits one through three, which had been marked as court exhibits during the defendant's trial, we will refer to the three documents added to the record through rectification as the state's e-mail, the offender hit notification form and the Department of Correction information sheet.

[13] Because there was no specific reference, on the record, to any of these documents during the hearing on the defendant's postverdict motion on April 4, 2014, we conclude that the court, in indicating that it had previously been made aware of the documentation sought to be introduced in the defendant's motion for rectification, was referring to the same "information" to which it alluded as having been provided to it in chambers prior to the commencement of the April 4 hearing.

[14] In moving for rectification and seeking to have only the three documents

made part of the record so that he could raise a *Brady* claim on appeal, the defendant should have been aware of other options available to him to further perfect the record and to preserve the claim at trial, including requesting an evidentiary hearing pursuant to *State* v. *Floyd*, 253 Conn. 700, 730–32, 756 A.2d 799 (2000) (defendant may request hearing to create factual record and obtain factual findings necessary to properly present *Brady* claim on appeal when he was precluded from doing so previously because new information was obtained postjudgment). After the defendant's motion for rectification was granted, he chose not to ask the trial court to conduct an evidentiary hearing to consider the merits of his *Brady* claim based on this new documentation.

The defendant is not now entitled to have the matter remanded by this court to the trial court for a *Floyd* hearing to further perfect the record, especially because he has indicated, adamantly, that he does not need, and therefore, does not request, this alternative relief. See *State* v. *Ouellette*, 295 Conn. 173, 183–84, 989 A.2d 1048 (2010) (although defendant claimed in his intermediate appeal that Appellate Court should order *Floyd* hearing to determine whether state withheld impeachment evidence, he did not renew claim in his certified appeal to Supreme Court or ask for such relief in alternative; consequently, he abandoned any such claim for relief).

[15] Because the defendant bears the burden of proving each of the three prongs of the *Brady* test, we need not address the favorability or the suppression prongs. See, e.g., *Morant* v. *Commissioner of Correction*, supra, 117 Conn. App. 296 (if petitioner fails to satisfy burden of proof as to one of *Brady*'s three prongs, court must conclude that *Brady* violation has not occurred).

[16] In *Ortiz*, the court discussed the lack of clarity in its prior opinions, as follows: "Compare, e.g., [*State* v. *Wilcox*, 254 Conn. 441, 452–55, 758 A.2d 824 (2000)] (reciting governing legal principles without stating standard of appellate review) with *State* v. *Pollitt*, 205 Conn. 132, 147–49, 531 A.2d 125 (1987) (noting that 'the determination of materiality has been said to be "inevitably fact-bound" and like other factual issues is committed to the trial court in the first instance,' but characterizing trial court's determinations about whether there was " 'reasonable probability' " that the result of the trial would have been different,' as 'conclusions of law,' but also recognizing 'the difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits such as this; this lack of certitude suggests deference by a reviewing court especially in the weighing of evidence') and *State* v. *Shannon*, 212 Conn. 387, 400, 563 A.2d 646 (citing *Pollitt*, but reviewing trial court's materiality determination for abuse of discretion), cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989)." *State* v. *Ortiz*, supra, 280 Conn. 718–19.

[17] There were two sets of internal affairs records in *State* v. *Bryan*, supra, 193 Conn. App. 310–11, that were the subject of the defendant's *Brady* claim: a set from 2008 and a set from 2005. During a 2017 hearing on a motion for augmentation and rectification before the trial court, the state conceded that it had not disclosed the 2008 records prior to trial, and, during a second hearing on a motion for augmentation and rectification of the record in 2018, the parties entered into a stipulation that the 2005 records also had not been disclosed prior to trial. Id., 309–11. The trial court, however, never ruled on whether the state's failure to disclose the records constituted a *Brady* violation. Id., 312–13.

[18] Our Supreme Court in *State* v. *Ortiz*, supra, 280 Conn. 686, noted that its decision in *State* v. *Floyd*, 253 Conn. 700, 732–33, 756 A.2d 799 (2000), had established a procedure by which evidence could be developed to explore claims of potential *Brady* violations in "the unusual situation in which a defendant was precluded from perfecting the record due to new information obtained after judgment." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 713 n.17. This would include seeking a full evidentiary hearing, a *Floyd* hearing, to augment the record. The purpose of a *Floyd* hearing is to permit the "rapid resolution of these fact sensitive constitutional issues and mitigate the effects of the passage of time that would accompany requiring defendants to wait to address these matters until after the conclusion of direct appellate review. Indeed, the potential memory fade attendant to this delay conceivably might even reward the state for violating *Brady*." Id., 714 n.17. In determining that we can address unpreserved *Brady* claims under *Golding* in a direct appeal, we are furthering the policy favored by our Supreme Court of promoting "rapid resolution" of *Brady* issues. Id.

[19] The defendant does not dispute that the sweatshirt was 600 feet away from where Martinez' vehicle was stopped on Hendricxsen Avenue at the

time of the shootings.

[20] The defendant testified that he had once been a member of the Los Solidos street gang.

-------------------